# EXHIBIT A

8/20/2020    Dozens of Philadelphia police were reinstated after top brass tried to fire them. New court records show how it keeps happening

Case 2:17-cv-05220-KSM    Document 20-1    Filed 01/03/24    Page 2 of 85

eshingle...▾

# The Inquirer

NEWS    SPORTS    BUSINESS    OPINION    POLITICS    ENTERTAINMENT    LIFE    FOOD    HEALTH    REAL ESTATE



# Fired, then rehired

Once-secret records show how the police arbitration system overturned the firings or discipline of more than 100 questionable Philadelphia cops.

**by William Bender** and **David Gambacorta**, Updated: September 12, 2019

After finishing his shift at 2 a.m., Officer Hashaam Choudri returned to his Northeast Philadelphia apartment, poured himself a glass of Grey Goose vodka, and waited for the prostitute he'd ordered to arrive.

"Getting a party started," Choudri invited a friend in a text.

The 33-year-old Philadelphia police officer would later claim that he wasn't looking for sex when he hired the woman from Backpage.com, a clearinghouse for prostitutes seized last year by the FBI. All he wanted, he insisted, was some female companionship.

But when two women arrived at his apartment around 4:35 a.m. on Oct. 29, 2016, Choudri paid the agreed-upon amount of $200, and one of them performed oral sex on him in his bedroom.

/

8/20/2020     Dozens of Philadelphia police were reinstated after top brass tried to fire them. Court records show how it keeps happening

Case 2:17-cv-05220-KSM    Document 20-1    Filed 01/03/24    Page 3 of 85

Choudri told them that he was a cop and showed off his gun and badge to impress them, according to a cell phone video taken by one of the women. Later in the footage, they can be seen in his walk-in closet, trying on his clothes.

The encounter led to an Internal Affairs investigation, which sustained charges against Choudri of soliciting a prostitute and association with a known criminal. A Police Board of Inquiry, consisting of a captain, lieutenant and rank-and-file officer, found him guilty of both counts, and unanimously agreed he should be fired. Then-Police Commissioner Richard Ross concurred.



**JESSICA GRIFFIN / FILE PHOTOGRAPH**
Former Police Commissioner Richard Ross was often exasperated by arbitrators who questioned his decision to fire officers accused of committing crimes.

Choudri's union, the Fraternal Order of Police Lodge No. 5, contested his firing by filing a grievance that rested on a novel defense: Choudri didn't understand that the oral sex he received for $200 was an actual transaction — because he lacked certain social skills, and was raised Muslim.

Under the labor contract between the city and the police union, the two parties settle such disputes with binding arbitration. James C. Peck Jr., the arbitrator presiding over the case, said in a March 2018 ruling that he did not believe Choudri "had some sort of diminished capacity which prevented him from understanding the difference between companionship and sex for hire," and rejected the FOP's argument.

However, Peck noted, he found the officer to be an "impressive young man who is quite articulate," and brought up a mitigating circumstance: Choudri's transgressions had been kept secret.

### RELATED STORIES

- **Could this state commission help weed out bad cops?**
- **Inside the once-secret misconduct files of 27 Philadelphia police officers**

"[T]here was no evidence that Officer Choudri's conduct was a source of tension or concern to other employees to the point that they refused to work with him," Peck wrote. "With respect to the consideration of harm to the Philadelphia Police Department, the events in question appear to have not been reported in any media outlet or social media outlet."

Finding Choudri an "otherwise acceptable employee," Peck ordered the officer returned to the force. He is now patrolling the 26th District, headquartered in Fishtown. Choudri didn't reply to requests for comment.

Choudri's case is among 170 previously confidential police arbitration opinions and settlements that The Inquirer obtained through a Right-to-Know request. Such unredacted records, which rarely see the light of day, reveal the behind-the-scenes machinations that enable officers to regain their jobs and ranks after they've been fired or demoted.

> "In our profession, the few taint the many. And that's the problem."
>
> **Former Police Commissioner Charles H. Ramsey**

An analysis of the cases, which date from 2011 to 2019, shows that the FOP has successfully fought to have police discipline overturned or reduced about 70 percent of the time.

The cost to taxpayers adds up: Among the 170 cases, the city has paid 26 officers at least $1.2 million in back pay and other payments. (The police department said it was unable to locate records of all payments to officers involved in arbitration since 2011). In addition, the city has paid nearly $4 million to settle federal lawsuits involving 15 of the officers.



**CHARLES FOX / FILE PHOTOGRAPH**
Former Police Commissioner Charles H. Ramsey believes arbitrators don't consider the impact their rulings have on the police department and the city when they reinstate cops who were dismissed for misconduct. "The reputation of the department gets harmed."

To the FOP, the arbitration system is a useful defense against bosses who haphazardly fire cops when they're accused of misconduct. To police officials, the fact that arbitrators have the final call on discipline is a maddening obstacle to cleaning up the department.

"Philly is not a bad police department at all. It's good. But it will never realize its full potential as long as you have a system in place like this," said former Police Commissioner Charles H. Ramsey. "Any organization is only as good as the people in it. The majority of people are good people. But in our profession, the few taint the many. And that's the problem."

Interviews with current and former police leaders, officers, city officials, arbitrators and union leaders reveal there is plenty of blame to go around whenever a new, incendiary scandal makes it seem like corruption is woven into the police department's DNA.

**READ PROFILES OF PROBLEM COPS**



### Inside the once-secret misconduct files of 27 Philadelphia police officers

These police arbitration files detail evidence commissioners used to fire problem officers and the often-successful efforts by the police union to get punishment overturned.

## 'It's a crime!'

Call it whatever you'd like — the Blue Wall of Silence, the Thin Blue Line — but law enforcement agencies have long been accused of looking the other way when one of their own commits a crime. Yet the arbitration records show that the Philadelphia Police Department's Internal Affairs Division is capable, at times, of building thorough cases against officers who've done things that would leave an average citizen in handcuffs.

Even those efforts, though, can end up being inadequate in an arbitrator's eyes.

While most of the city was still asleep on an early March morning in 2016, a 24-year-old woman called 911 and reported that her ex-boyfriend, a young off-duty cop named Alex McAdams, had pounded on the door of her Northeast Philly apartment and then shattered her bedroom window.

Four patrol officers and an Internal Affairs supervisor quickly arrived and found blood spattered everywhere: on the sidewalk outside the woman's bedroom, streaked across her carpet, smudged on door handles and light switches. A white-gold necklace and a police badge charm were missing from her jewelry box, which was marked by bloody fingerprints. McAdams was nowhere in sight.

McAdams would later claim that he'd visited the woman's apartment at 2:30 a.m. out of concern, because she'd complained earlier of not feeling well. As for the broken window? It was "precariously glazed," McAdams told an arbitrator, and simply broke when he knocked.

But he painted a different picture in a Facebook post that morning: "Glad I stuck with my gut feeling. Caught my girlfriend cheating. Both ran like cowards. Glad I got my badge neckless [sic] back. No dirty slut ho ... is wearing my badge on their chest. I knew it!!!"

Internal Affairs investigators copied the post, obtained a six-page statement from McAdams' ex-girlfriend, interviewed her neighbor, and matched the blood in her apartment to crimson stains that they found in McAdams' Dodge Charger. The missing necklace was located in the trunk. The District Attorney's Office charged him with burglary, criminal trespass, theft, and criminal mischief, and Ross fired him.

**SOLUTIONS**



### Could this state commission help weed out bad cops?

The state Municipal Police Officers' Education and Training Commission can revoke the licenses of officers convicted of certain crimes or deemed unfit for duty, but rarely does.

But the criminal charges were soon dismissed on a technicality: McAdams' ex-girlfriend didn't appear to testify. The couple later got engaged.

McAdams' fate ended up in the hands of Peck, the 70-year-old arbitrator, who is based in Media. In a January 2019 ruling, Peck wrote that although a "police officer needs to behave better than this," he believed that dismissal was too extreme, and ordered McAdams to be reinstated, as long as he completed anger management classes. Peck did not respond to requests for comment.

All of the records pertaining to McAdams' criminal case have since been expunged or sealed, leaving no public trace in the criminal court system that he had ever been charged.

During a July interview, Ross couldn't hide his frustration as he recounted, in general, how arbitrators questioned him about each decision to fire an officer for misconduct.

"They're asking me, 'How does this correlate to being a police officer?'" Ross said. "It's a crime! What are you talking about?"

> "They're asking me, 'How does this correlate to being a police officer?' It's a crime! What are you talking about?"
>
> **Former police commissioner Richard Ross**

(A month after the interview, Ross abruptly resigned, bringing his 30-year career to a stunning end. A female officer had accused him in a lawsuit of retaliating against her because she'd ended an affair with him.)

Cases like McAdams' can convey a muddled message to younger cops who are trying to understand how the police force functions. They're expected to embody the department's core values — honor and integrity — at all times. But getting caught up in a criminal case, even one based on plenty of evidence, can end up being the equivalent of a paperwork speed bump.

"If they get their back pay, then they got a paid vacation. I don't know if that's a good teaching tool," said Kevin Gallagher, a former Law Department employee who specialized in labor relations.

Once back on the job, tainted cops can create problems for prosecutors when those same officers are required to testify in criminal cases. Officers' misconduct — which must be disclosed to the defense if it is relevant to the case — could undermine their testimony or police work in the minds of jurors and judges.

"We lose legitimate cases because we end up with officers who should no longer be on the force, or should have been reassigned, as key witnesses in important cases," said District Attorney Larry Krasner. "We end up having to turn over information on police officers who have very questionable records, which is then used to persuade a jury that they cannot be trusted."

/

8/20/2020    Dozens of Philadelphia police were reinstated after been bound to the job in 0103/24 records show how it keeps happening

Case 2:17-cv-05220-KSM    Document 20-1    Filed 01/03/24    Page 7 of 85



**ED HILLE / FILE PHOTOGRAPH**
Anthony DiLacqua, now retired, oversaw Internal Affairs from 2008 to 2010.

Some of the records obtained by The Inquirer detail relatively minor matters — insubordination, lying about doctor's visits, violating the department's residency requirement. But others involve allegations that are more disturbing: sexual assault, brutal displays of domestic violence, stalking, lying under oath.

Anthony DiLacqua, a retired police chief inspector, oversaw Internal Affairs from 2008 to 2010. He and his investigators had no say in how discipline was meted out; their job was limited to determining whether an allegation could be sustained. Still, they were often dismayed when cops returned to the force after Internal Affairs had determined the officers had committed serious offenses.

"We all have a vested interest in trying to keep someone off the job who exhibits behavior that's intolerable," DiLacqua said.

8/20/2020 Dozens of Philadelphia police were reinstated after top brass tried to fire them. One court records show how it keeps happening

Case 2:17-cv-05220-KSM    Document 20-1    Filed 01/03/24    Page 8 of 85

For years, he said, police commissioners have opted to hastily get rid of cops whose alleged misbehavior attracted media attention. McNesby ran through examples, from the 13 officers fired in July for racist Facebook posts, to a squad of six narcotics cops dismissed in 2014 after they were indicted on federal corruption charges. (Ramsey had vowed to melt the narcotics officers' badges. Instead, they were acquitted, and got their jobs back.)

Commissioners "just fire with no just cause, zero investigation, and then point the finger at us," McNesby said, perched at the end of a long conference table, next to his vice president, Roosevelt Poplar, and Richie Costello, the FOP's political coordinator.



CHARLES FOX / STAFF PHOTOGRAPHER
FOP president John McNesby (center), and his vice president Roosevelt Poplar (left) and former president Richard Costello (right) insist the union has no choice but to fight for fired cops when police commissioners don't abide by disciplinary guidelines.

"It's a lynching," Costello said.

The three men insisted that the union is just playing by the rules of Act 111, a state law that requires disputes between government agencies and unions to be resolved through binding arbitration. In that scenario, the FOP's task is to simply prove that police bosses either fail to follow the terms of the disciplinary code that's laid out in the union's contract with the city, or rely on shoddy Internal Affairs investigations.

It's easy to poke holes in those investigations, McNesby said: "It's like, you know, you're going to throw a dart at a wall full of balloons. You're gonna hit one of them."

Costello, who ran the union from 1988 to 1990, and then again from 1994 to 2002, chimed in: "Everybody's entitled to due process. That's our main job. We may not even like the guy, but you have to fire him right. If you fire him right, we can't win."

McNesby said he and other union officials gather every Monday for about two hours to review disciplinary cases and discuss whether they should file a grievance on an officer's behalf, the first step on the road to arbitration.

The FOP often reaches a settlement agreement with the city before a case gets to an arbitrator's desk. The reasons can vary. A witness may refuse to testify or can't be reached, for instance, or city officials may want to avoid having an arbitrator issue a steep award. Since 2011, the police disciplinary cases that have been decided by an arbitrator, as opposed to a pre-hearing settlement, are roughly split between those denied and those fully or partially granted.

"We're not taking rapists back," said McNesby, who's been in charge of the union since 2007. "We're not taking people that are slapping their wives back."

In fact, several cops who were fired for domestic violence did get their jobs back through arbitration, with the union's support. In each case, the arbitrator was a man.

"What we're seeing with a lot of these domestics — not saying that some of them aren't really pathetic — but some of them are simple arguments between husband and wife," McNesby said. "There's accusations made, and the next day, when they both sober up, they're going, 'Oh boy, what did we do?' And it ends there."

When Bristol Township police were called to the home of Philadelphia police officer Mark Malaczewski for a report of a domestic incident in February 2014, his girlfriend was clutching her shoulder and holding a clump of her own hair. She told police that Malaczewski had punched her and pushed her down, knocking her head into a brick fireplace, according to the records.

## Officer James Timms

Terminated following a January 2013 incident of domestic violence. Ordered reinstated, but failed psychological exam needed to return to the force.

Police responded to Timms' house after a neighbor called police about a domestic dispute involving two married police officers and a gunshot. Timms' daughter told investigators that Timms had punched his wife in the face and slammed her head on the floor, busting her lip and breaking two upper front teeth. "I am going to kill you," he warned both women, according to the daughter. They fled and Timms allegedly fired a round from his wife's service pistol into the first-floor ceiling, then initially lied about firing the gun. He later said it was a failed suicide attempt.

Criminal charges were filed against Timms, but he was acquitted in December 2014 after his wife and daughter ignored subpoenas to

**EXPAND**

Malaczewski pleaded guilty to harassment and disorderly conduct involving fighting, Bucks County court records show, and was fired from the police force. But two years later, arbitrator James Darby ruled that he should be reinstated.

And when Officer Joseph Griffin was fired in 2014 for allegedly punching and choking his wife and threatening to kill her if she left, the FOP fought for him to be rehired.

Griffin's wife said he had assaulted her, and the city presented an arbitrator with chilling text messages that he'd sent her: "I'm gonna beat the s— out of u tonight ... The other ones ain't s— compare (sic) to what you got coming tonight."

8/20/2020    Dozens of Philadelphia police who were reinstated after top brass tried to fire them, 1708/24 get records of misconduct happening

Case 2:17-cv-05228-KSMF    Document 28-1    Filed 01/03/24    Page 10 of 85

## Officer Aisha B. Pleasant

Fired in 2012 after being charged with aggravated assault, resisting arrest and obstruction of justice in Atlantic City. Arbitrator Timothy J. Brown upheld the firing.

One night seven years ago at Caesars' Pier, Pleasant — who was off duty — and her pals got into an argument with management and were escorted off the premises. "You returned and punched an on-duty officer, then left," Internal Affairs investigators wrote in a notice of dismissal. Atlantic City Police Officer James Herbert later recalled that Pleasant appeared intoxicated, and told him to "go f— yourself" when he walked Pleasant and her friends down a stairwell. She then grabbed onto a railing, refused to let go, and bit Herbert's hand.

Pleasant had to be carried 200 yards to a patrol car, then into a police station, where she refused to give her name.

**EXPAND**

According to the arbitration records, the FOP claimed that the text messages were "of no consequence here." Even so, arbitrator David J. Reilly upheld the firing.

Despite McNesby's insistence that the union won't represent rapists, it has filed grievances on behalf of cops who were accused of sexual assault.

In December 2011, a North Philly woman told Internal Affairs she'd had a horrific encounter with Officer Albert Phipps inside a holding cell in the 9th Police District's headquarters at 21st and Hamilton Streets.

The woman, who had been arrested for shoplifting, claimed that Phipps walked into the room, instructed her to pull her pants down, and began grinding against her. In the moments that followed, he allegedly sucked one of her breasts and fondled her vagina.

Internal Affairs determined that Phipps' DNA was on the woman's bra. Ramsey fired Phipps, later telling arbitrator Robert E. Light that the cop had a troublesome history. The FOP sought to have Phipps' reinstated, but Light rejected them. The woman sued Phipps and the city, and received a $110,000 settlement. (Phipps couldn't be reached for comment.)

Numerous commissioners, from outsiders like Ramsey and John Timoney, to homegrown ones like Sylvester Johnson and Ross, have complained of being stymied by the union when they attempted to make the police force more honest.

Case 2:17-cv-03112-MK-SM Document 23-1 Filed 01/08/24 Page 11 of 85



**JESSICA GRIFFIN / FILE PHOTOGRAPH**
Sylvester Johnson, who served as police commissioner from 2002 until 2008, tried in vain to get the FOP to help him draft a new disciplinary code.

Johnson was rebuffed by the union in 2005 when he sought their input in updating the department's disciplinary code, which dated to the late 1960s. Ramsey, fed up with a spate of scandals that greeted the start of his tenure in Philadelphia, unilaterally implemented a new code in 2010, nearly doubling the number of rules to 107. The union complained to the state Labor Relations Board, but ultimately accepted many of the new rules in its 2014 contract with the city.

It remains to be seen whether McNesby will clash with Christine Coulter, the interim police commissioner, or a replacement that Mayor Jim Kenney could pluck from another part of the country. But whoever runs the police department will have to contend with the arbitration process; according to the city, there are currently about 150 open cases pertaining to police discipline and contract-related disputes.

# Ineptitude or an uneven playing field?

Union leaders and police officials aren't the only players in an arbitration hearing. Attorneys from the Office of the City Solicitor present the police department's evidence in what amounts to a mini-trial. And The Inquirer's analysis shows that the city has long been outmaneuvered by the FOP's lawyers.

"It's like the L.A. Lakers or the 76ers going up against a grade school team," McNesby said. "I mean, it's not that hard."

McNesby's playground jab was echoed by Leon King, who worked for more than a decade in the solicitor's office, and negotiated numerous arbitration settlements when he was assigned to the Labor and Employment Unit. He, too, didn't mince words.

"The unit that handles these cases, where I used to work, typically the attorneys are new, and don't stay long. They don't get any training in regard to the arbitration process, or what arbitrators look for," he said. "They wing it."

King, who went on to serve as the commissioner of the city's prison system, accused the solicitor's office and the Law Department of failing to develop a strategic response to the FOP's long-running success in arbitration hearings.



**DAVID MAIALETTI / STAFF PHOTOGRAPHER**
Deputy City Solicitor Cara Leheny, of the Law Department's labor and employment unit, said winning arbitration cases is a challenge when witnesses aren't available to testify. But she said her attorneys are capable of taking on the FOP's experienced arbitration lawyers.

Cara Leheny, a deputy solicitor in the Law Department's labor and employment unit, strongly disputed that: "Our unit attorneys are intelligent, hardworking, persistent, creative, and equal to our colleagues on the other side."

Leheny noted that in arbitration the city bears the burden of proof. Even if an Internal Affairs investigation finds strong evidence of police misconduct, much of that evidence then has to be reproduced at arbitration hearings months or even years later. Witnesses who spoke to Internal Affairs near the time of the alleged crime or misconduct may have moved out of state, or filed lawsuits against the city, making them reluctant to testify. Others don't want to take a day off work to sit through a cop's hearing.

Case 2:17-cv-03624-SWR   Document 20   Filed 11/08/21   Page 13 of 85

"It's tough," Leheny said. "It's just very tough."

## Officer Anthony Abrams

Terminated in June 2017. Violations include: lying during an investigation, associating with people engaged in criminal activity, and unapproved outside employment. Reinstated in May 2018.

Internal Affairs began investigating Abrams in June 2015 after he shot at a man who he said had robbed his live-in girlfriend. He told police that he had driven her to Brewerytown, around 1:30 a.m., to buy a cell phone from a man who had advertised it on Craigslist. The preliminary investigation suggested instead that his girlfriend "had been scheduling an appointment to provide prostitution services," according to arbitration records.

Abrams' girlfriend later told an Internal Affairs Division lieutenant that Abrams' cell-phone story was a lie — that she was a prostitute and Abrams essentially was her pimp. For months, she said, he had been driving her to escort appointments. During sexual exchanges

**EXPAND**

Wives who are victims of domestic abuse are particularly prone to recant, sometimes under pressure from their family, or because they may want the officer to keep his job.

"If a victim is financially dependent on the abuser, that's another reason why she might not follow through" by testifying in criminal court or at an arbitration hearing, said John Delaney, a former First Assistant District Attorney who has handled police misconduct cases.

In a recent interview, Kenney said negotiations have begun to renew the FOP's contract, which expires in June 2020. He said the city would again look for ways to keep bad cops off the force.

"It's frustrating when we got a person we know shouldn't be there and they're put back," Kenney said. "It's frustrating for me and frustrating for all of us."

But his administration won't have a free hand in setting the terms of a new contract. If the union opposes any disciplinary changes in its next contract, Kenney said: "We're at the mercy of the arbitrator."

Krasner insisted city officials need to find a way to address the issue.

"There is little doubt that there needs to be changes in the police contract," he said.

8/20/2020    Dozens of Philadelphia police were reinstated after arbitrations tied to their DROP ticket records show how it keeps happening

Case 2:21-cv-08128-KSM    Document 28-1    Filed 01/05/24    Page 14 of 85



**ELIZABETH ROBERTSON / FILE PHOTOGRAPH**
Christine Coulter, the interim police commissioner, or a replacement chosen by Mayor Jim Kenney, will have to navigate the arbitration process. The city has about 150 open arbitration cases pertaining to police discipline and contract-related disputes.

Some former city officials say the secrecy that surrounds arbitration is problematic, because arbitrators are rarely forced to account for rulings that seemingly reward bad cops, and those little-explained decisions can inflame tensions between the police department and communities that are already distrustful of law enforcement.

"The reputation of the department gets harmed. That's obviously true," Ramsey said. "But the bottom line is, it's the public that I think gets the raw end of the deal."

Speaking at an arbitrators' conference in Philadelphia in June, Ramsey urged the attendees to consider how their decisions can impact the city. "Is this a person who should be out there with a badge and a gun, serving the public?" he recalled telling them. " ... I don't see how you cannot take that into consideration."

Gallagher, who represented the city in police arbitration cases before leaving in the mid-1990s to run a bed and breakfast in California, agreed that the city has long been outgunned by the FOP's lawyers. But he also maintains a sour view of how arbitrators render their decisions.

8/20/2020    Dozens of Philadelphia police were reinstated after being fired to the brim. Do these arrest records show for cops happening

Case 2:17-cv-06220-KSM    Document 26-1    Filed 01/08/24    Page 15 of 85



**HEATHER KHALIFA / STAFF PHOTOGRAPHER**
Stanley L. Aiges, a veteran arbitrator, said the FOP's continued success in getting police firings overturned is "more a reflection of the ineptitude and overzealousness of the police department."

"Arbitrators are strange," Gallagher said. "Those guys don't like to bite the hand that feeds them." And, Gallagher added, arbitrators have something in common with the cops that appear before them for hearings: They both want to keep working.

Unsurprisingly, the argument that arbitrators aren't neutral doesn't sit well with the arbitrators themselves.

"That's bull—, pure bull—. That's the sore loser's argument," said Stanley L. Aiges, who's worked as an arbitrator for more than 50 years. "The FOP's [success] is more a reflection of the ineptitude and overzealousness of the police department. They make a lot of stupid decisions."

Aiges presided over three of the 170 cases reviewed by reporters. He ruled in favor of an officer once. "Arbitrators depend on both sides to be selected," he said. "The only way to ensure that you have that acceptability factor is to call them as you see them."

8/20/2020    Dozens of Philadelphia police were reinstated after bosses tried to fire them. Once secret records show how it keeps happening

Case 2:17-cv-05220-KSM    Document 20-1    Filed 01/03/24    Page 16 of 85



**PHILADELPHIA POLICE DEPARTMENT**
Joseph Griffin, Deric Lewis and Alex McAdams were fired for domestic incidents. McAdams was reinstated, as was Lewis — twice. Griffin lost his case after an arbitrator read text messages the officer sent his wife such as: "I'm gonna beat the s— out of u tonight."

## A peek behind the curtain

Many of the cases that are outlined in the arbitration records reveal allegations and Internal Affairs investigations that had never otherwise been public.

In recent years, the city has only released heavily redacted versions of police arbitration cases that revealed the cases' outcomes, not the underlying facts or arbitrators' findings.

Some of the newly disclosed settlements, some only two pages, offer no explanation of why an officer was headed towards arbitration in the first place. The only hint the public might get is if the officer's conduct was described in lawsuits.

That proved to be the case with an officer named Anthony Avery, whose name appears on a 2012 settlement agreement that showed he would be transferred to the Center City Police District, without elaborating on where he'd previously been stationed, or why the transfer was necessary.

Avery, however, appears frequently in court records. Between 2008 and 2014, he was sued four times in federal court, two of them for police-involved shootings that left two men dead: Timothy Goode Jr., and Laurence Ward. All told, the city has spent more than $227,000 settling lawsuits against Avery.

He hasn't kept a low profile since being moved to a district that's a stone's throw from tourist attractions like the Liberty Bell and Independence Hall. City records show that five civilians have filed complaints against Avery since 2015. The police department is still investigating two complaints from last year, one for physical abuse, the other for verbal abuse.

8/20/2020  Dozens of Philadelphia police were reinstated after bosses tried to fire them. Once we get records show how it's happening

Case 2:17-cv-05220-KSM   Document 26-1   Filed 01/03/24   Page 17 of 85

Ramsey, in his last official action as commissioner, fired Lewis' again after police said his wife called 911 from their Upper Darby home in 2015, and told an operator: "Please hurry. He has a gun and he's going to kill me." When police arrived, Lewis' wife was uncooperative, and Lewis refused to give them his name or identify himself as a police officer — a violation of a Philadelphia police directive. He tussled with one of the Upper Darby officers and later pleaded guilty to a charge of disorderly conduct/engaging in fighting.

James Peck — the same arbitrator who last year reinstated Hashaam Choudri, the officer who had hired a prostitute, and this year reinstated Alex McAdams, who broke into his girlfriend's apartment — heard Lewis' case.

In his ruling, Peck acknowledged Lewis' "stunning lack of common sense" and "remarkably bad judgment" during his altercation with Upper Darby police. But then Peck transitioned to a surprising conclusion.

"I am unconvinced that Lewis, an otherwise acceptable employee, is beyond redemption," he wrote, in ordering Lewis reinstated.

Lewis — whose life motto on Facebook is "I am not mean. I am blunt" — would soon prove Peck wrong.

In December 2017, Lewis was arrested for a fourth time, in Yeadon Borough. He pleaded guilty in March 2018 to disorderly conduct/engaging in fighting and was fired a third time. The FOP has refused to file a grievance on Lewis' behalf.

Reached by phone this month, Lewis said his most recent arrest was another domestic disturbance with his wife, who he said was intoxicated and angry at him. He said an FOP official told him the union wouldn't support him because it was the "same situation over and over" involving Lewis and his wife.

Lewis said he feels betrayed.

"I understand you get fed up with stuff like that, but each officer is supposed to have a grievance filed on their behalf," he said. "I've seen officers who beat up their significant others, with black eyes and they're hospitalized and all that, and they continued to work the whole time."

*Staff writers Dylan Purcell and Juliana Feliciano Reyes contributed to this article.*



**ELIZABETH ROBERTON / FILE PHOTOGRAPH**
The police union's contract expires next summer. As part of negotiations, Mayor Jim Kenney said the city will seek to keep bad cops off the force, but he realizes the FOP can oppose any suggested changes.

💬  View Comments

## Good Reads



**'This is the moment:' At a West Philly church, hard-earned progress in a multifront battle**



**'Totally blindsided': Tenants and attorneys say evictions come as a surprise | Editorial**



**At 85, former Phillies strength coach Gus Hoefling is battling cancer — and Big Tobacco**

TWITTER        FACEBOOK        INSTAGRAM

NEWS & INFO

News  /  Sports  /  Entertainment  /  Business  /  Health  /  Food  /  Life  /  Opinion  /  Archives  /  Special Reports

ABOUT US

About The Philadelphia Inquirer  /  Advertise  /  Contact Us  /  Licensing & Permissions  /  Photo Reprints  /  Newspapers in Education  /
Jobs & Internships  /  Inquirer Events  /  Acel Moore Workshops  /  Newsroom Staff

MARKETPLACE

Inquirer Store  /  Find a Home  /  Job Listings  /  Special Sections  /  All Classifieds  /  Gift Subscriptions

MOBILE APPS

Inquirer News  /  Philly Sports Now



THE INQUIRER

Digital Edition

Subscriber Services

THE DAILY NEWS

Digital Edition

Subscriber Services

The Philadelphia Inquirer

© 2020 The Philadelphia Inquirer, LLC   Terms of Use   /   Privacy Policy

8/20/2020
Dozens of Philadelphia police were reinstated after dept bosses tried to fire them. Now that reflects a culture of 'cops helping cops' happening
Case 2:11-cv-05220-KSM    Document 20-1    Filed 01/03/24    Page 20 of 85

# The Philadelphia Police Misconduct Database

An Inquirer analysis of 170 arbitration outcomes of alleged Philadelphia police misconduct shows that the Fraternal Order of Police has successfully reversed or reduced department-imposed discipline **more than two-thirds of the time**. Records of these cases, which are typically confidential, were obtained by The Inquirer through a Right-to-Know request and date back to 2011.

Type in the box below to search for individuals. Click on a name for records of the case.

Search in table

| Name | Rank | Alleged misconduct | Outcome |
|------|------|--------------------|---------|
| Abrams, Anthony | Officer | Sex: prostitution and unapproved outside employment | Grievance partially granted |
| Akil, Nashid | Sergeant | Failure to supervise: ignored directive to check PFA orders | Grievance granted |
| Alba, Danielle | Officer | n/a | Settled: suspension reduced |
| Amato, Kristine | Officer | Conduct unbecoming: lying about phony doctor's appointments | Grievance partially granted |
| Arch, Steven | Lieutenant | Failure to supervise | Settled: discipline reduced |
| Archie, Eyleen | Officer | Abuse of authority: unauthorized call for police backup | Grievance denied |
| Avery, Anthony | Officer | n/a | Settled: transferred |
| Ayres, Dan | Sergeant | Failure to supervise | Grievance denied |
| Bartorilla, Joe | Inspector | Failure to supervise | Settled: suspension reduced to reprimand |
| Baynes, Keith | Officer | Excessive use of force on suspect in custody | Grievance granted |
| Beasley, Demetrius | Sergeant | Conduct unbecoming: stealing utility services | Grievance denied |
| Belciano, Jason | Officer | Drugs: steroids use | Grievance granted |
| Bell, Doris | Officer | Neglect of duty | Settled: suspension reduced |
| Bell, Meika | Officer | Conduct unbecoming | Settled: termination reduced to suspension |
| Billips, Roxanne | Officer | Conduct unbecoming: multiple offenses | Grievance denied |
| Binns, Robert | Officer | Conduct unbecoming: neglect of duty | Settled: suspension reduced |
| Black, Maurice | Sergeant | Residency clause violation | Grievance denied |
| Blackmon, Darien | Lieutenant | Conduct unbecoming | Settled: suspension reduced to reprimand |
| Boyer, Andre | Officer | Conduct unbecoming and disobedience | Grievance granted |
| Boyer, Andre | Officer | Conduct unbecoming and disobedience (lying, abuse of authority) and disobedience | Grievance denied |
| Branish, William | Officer | Drugs: mailing marijuana | Grievance denied |
| Brooks-Whitaker, Theresa | Officer | Insubordination | Grievance denied |
| Brown, Britton | Officer | Insubordination | Grievance granted |
| Burke, Sir James | Officer | Conduct unbecoming: lying about military leave | Grievance denied |
| Byrd, Aquil | Officer | Assault | Grievance granted |
| Cahill, Sean | Officer | False statement (see Officer Harvey case) | Settled: reinstated |
| Campbell, Martin | Officer | Conduct unbecoming | Settled: termination reduced to suspension |
| Carbonara, Joanne | Officer | Conduct unbecoming | Settled: reinstated |
| Carrion, William | Officer | Conduct unbecoming | Grievance denied |
| Cathey, Darryl | Officer | Conduct unbecoming | Settled: reinstated |
| Chance, Debra | Corporal | Failure to supervise and inappropriate communications | Settled: demotion overturned |
| Choudri, Hashaam | Officer | Sex: soliciting prostitution, associating with criminals | Grievance granted |
| Ciarlante, John | n/a | Conduct unbecoming (lying) and insubordination | Settled: suspension reduced, transferred |
| Coco-Feinstein, Jennifer | n/a | n/a | Settled: suspension reduced to reprimand |
| Coco, Nicholas | Officer | Conduct unbecoming and insubordination | Settled: suspension reduced |
| Colville, Nicholas | Officer | n/a | Settled: termination reduced to suspension |

| Name | Rank | Offense | Outcome |
|------|------|---------|---------|
| Cook, Tyrone | Sergeant | Conduct unbecoming: stealing overtime | Grievance denied |
| Corrento, Gerard | Officer | Conduct unbecoming: sick time abuse | Grievance denied |
| Costello, Leo | Sergeant | Conduct unbecoming | Settled: suspension reduced |
| Cujdik, Jeffrey | Officer | Conduct unbecoming (See: Tainted Justice) | Grievance granted: reinstated |
| Dandrige, Sean | Sergeant | Neglect of duty: failure to investigate | Grievance denied |
| Davis, Randy | Sergeant | Conduct unbecoming and neglect of duty | Settled: suspension reduced |
| Dawson, Bryon | Officer | Conduct unbecoming | Settled: suspension reduced |
| Delagol, Barry | Officer | Sex: on duty | Grievance denied |
| Demnisky, Jon | Detective | Conduct unbecoming: lying, harassing civilian | Grievance denied |
| Eckert, Daniel | Officer | Insubordination and neglect of duty | Grievance partially granted |
| Farrell, Mitchell/Hanvey, Kevin | Officers | Disobedience: improper discharge of firearm | Grievance denied |
| Ferriola, Anthony | Officer | Conduct unbecoming: use of racial slurs | Settled: reinstated |
| Figueroa, Veronica | Officer | Lying about sick days | Grievance granted |
| Fitzgerald, Sheldon | Officer | Assault | Settled: termination reduced to suspension |
| Forest, Tony | Officer | Conduct unbecoming: drag racing resulting in fatality | Grievance partially granted |
| Ginaldi, Anthony | Lieutenant | Insubordination and making false entry | Settled: suspension reduced |
| Gonzalez, Stacey | Officer | Unauthorized absence | Grievance denied |
| Gore, Deorah | Detective | Retail theft | Grievance granted |
| Graber, James | Officer | Abuse of authority | Settled: suspension reduced |
| Graber, James | Officer | Domestic violence: punching wife in bar | Settled: reinstated |
| Green, James | Sergeant | n/a | Settled: demotion overturned |
| Gress, Brian | Lieutenant | Conduct unbecoming and neglect of duty | Settled: suspension reduced |
| Griffin, Erica | Detective | Neglect of duty | Settled: reference to suspension removed from file |
| Griffin, Joseph | Officer | Domestic violence and threatening wife | Grievance denied |
| Gross, Tamika | Officer | Failure to break up fight involving daughter | Grievance denied |
| Halbherr, Nicholas | Officer | n/a | Settled: suspension reduced to reprimand |
| Hargraves, John | Officer | Domestic violence | Grievance denied |
| Harris, Constance | Officer | Abuse of authority | Settled: suspension reduced |
| Hartzell, Steven | Officer | Neglect of duty | Grievance partially granted |
| Harvey, Joseph | Officer | Sex: masturbating on woman on-duty | Grievance denied |
| Haviland, William | Officer | Drunk on duty | Grievance denied |
| Herder, Arthur | Officer | Death threats | Grievance denied |
| Hill, Howard | Officer | n/a | Settled: termination reduced to suspension |
| Hill, Matthew | Officer | Domestic violence | Grievance granted |
| Holmes, Carl | Inspector | n/a | Settled: demotion reduced to suspension |
| Huff, Robbi | Officer | Domestic violence | Grievance granted |
| Jackson, Jerome | Officer | Failure to supervise | Settled: suspension reduced |
| Jessie, Darnell | Officer | Conduct unbecoming and neglect of duty | Settled: suspension reduced |
| Johnson, Margaret | Officer | n/a | Settled: suspension reduced |
| Jones-Wiggins, Bernita | Corporal | Interfering with criminal investigations of sons | Grievance denied |
| Jones, Melville | Officer | Conduct unbecoming | Grievance partially granted |
| Jordan, Dwayne | Officer | Sexual harassment | Grievance denied |
| Josey, Jonathan | Lieutenant | Striking woman in face at parade | Grievance granted |
| Kinard, Dion | Officer | Insubordination | Settled: suspension reduced |
| Klayman, David | Officer | Domestic abuse | Grievance granted |

| Name | Rank | Charge | Outcome |
|---|---|---|---|
| LaSalle, Anthony | Lieutenant | Neglect of duty and failure to supervise | Settled: one charge removed, restitution required |
| Lauf, Thomas | Detective | Insubordination | Settled: suspension reduced, transferred |
| Lawyer, Ernest | Officer | Fighting: swinging shovel at women | Grievance partially granted |
| Lawyer, Ernest | Officer | Fighting: with another officer | Grievance partially granted |
| Lewis, Deric | Officer | Domestic incident | Settled: reinstated |
| Lewis, Deric | Officer | Domestic incident, scuffle with arresting officer | Grievance granted |
| Lewis, Kevin | Officer | Insubordination | Settled: suspension reduced |
| Lewis, Michael | Officer | n/a | Settled: suspension reduced |
| Liciardello, Thomas and others | Officers | Narcotics squad corruption | Settled: reinstated and paid $90,000 |
| Long, Michael | Officer | Prohibited outside employment | Settlement: suspension reduced |
| Lupo, Steven | Officer | Conduct unbecoming, making false entry | Grievance granted |
| Malaczewski, Mark | Officer | Domestic abuse | Grievance partially granted |
| Manley, Melissa | Officer | n/a | Settled: reinstated |
| Mann, Cyrus | Officer | Improper discharge of firearm | Grievance granted |
| Marion, Joseph | Officer | Conduct unbecoming: assault | Settled: termination reduced to suspension |
| Marsh, Allen | Officer | Drugs: marijuana consumption | Grievance granted |
| Massi, John | Sergeant | Insubordination | Settled: suspension reduced |
| McAdams, Alex | Officer | Domestic incident, burglary | Grievance granted |
| McCollum, Robert | Officer | Insubordination | Grievance granted |
| McCrea, Andrew | Officer | n/a | Grievance denied |
| McHenry-Walker, Donna | Corporal | n/a | Settled: suspension reduced |
| McKnight, Sean and Robinson, Kevin | Officers | Excessive use of force | Grievance granted |
| Medycki, Walter | Sergeant | Conduct unbecoming | Settled: suspension reduced |
| Miles, Jamie | Officer | Falsified documents | Grievance denied |
| Miles, Jamie | Officer | Stealing time, falsified documents | Grievance partially granted |
| Mills, B. | Sergeant | Assault: off duty | Grievance denied |
| Mills, Michael | Sergeant | Conduct unbecoming | Grievance partially granted |
| Moore, Jerry | Officer | Theft: retail | Grievance denied |
| Moore, Tayon | Officer | Leaving the scene of an accident, criminal mischief, theft | Settled: termination reduced to suspension |
| Mostiller, James | Officer | Profane or insulting language or behavior | Settled: violation changed |
| Muhammad, Talib | Officer | Domestic violence | Settled: termination reduced to suspension |
| Mulholland, John | Sergeant | Excessive use of force | Grievance denied |
| Murray, Joseph | Detective | False statement while testifying | Grievance granted |
| Newsome-Middleton, Gail | Corporal | Insubordination | Grievance granted |
| Newsome, Marques | Lieutenant | Domestic violence | Settled: reinstated |
| Norman, Kendall | Officer | Conduct unbecoming: false entry | Grievance denied |
| Nuble, Lawrence | Lieutenant | Failure to supervise, neglect of duty | Settled: suspension reduced |
| O'Brien, Steve | Lieutenant | n/a | Setted: reinstated, must submit to steroid testing |
| O'Donnell, Adam | Detective | Assault of detainee | Grievance granted |
| Ortiz, Victor | Officer | Domestic incident: GPS stalking, lying | Grievance denied |
| Ortiz, Victor | Officer | Drugs: prescription pill abuse and overdose | Grievance granted |
| Paige, Michael | Officer | Sex: on duty. Filed grievance seeking promotion | Not arbitrated |
| Pasquarello, John | Officer | n/a | Settled: suspension reduced |
| Passalacqua, Gerald | Officer | Conduct unbecoming (lying) and disobedience | Grievance denied |

| | | | |
|---|---|---|---|
| Phipps, Albert | Officer | Sexual assault | Grievance denied |
| Pleasant, Aisha | Officer | Assault of officer | Grievance denied |
| Porretta, Joseph | Officer | n/a | Settled: restitution order withdrawn |
| Powell, Aletta | Officer | Insubordination | Grievance denied |
| Pressley, Sheila | Sergeant | Abuse of authority | Settled: suspension reduced to reprimand |
| Quaintance, David | Officer | n/a | Settled: reinstated |
| Randall, Stanley | Officer | Conduct unbecoming | Settled: suspension reduced |
| Rivera, Jacqueline | Corporal | n/a | Settled: transfer rescinded |
| Rossiter, Kenneth | Detective | Stealing time, including court OT while at home. | Grievance granted: reinstated |
| Ruff, Brandon | Sergeant | Bringing bag of guns to police station, lying | Grievance denied |
| Ryan, Joseph | Officer | n/a | Settled: suspension reduced to reprimand |
| Satterfield, Holley | Officer | Conduct unbecoming and insubordination | Grievance denied |
| Sawicki, Edward | Officer | Threats, using racial epithets | Grievance granted: reinstated |
| Schneider, Nicholas | Sergeant | Conduct unbecoming (false entry) and neglect of duty (absence without leave) | Settled: suspension reduced |
| Schweizer, Scott | Officer | Racist sticker in locker | Settled: suspension reduced, received $10,000 |
| Sees, Joseph | Officer | Domestic violence | Settled: termination changed to retirement with pension |
| Sherwood, Donna | Officer | Insubordination | Settled: suspension reduced |
| Smith, Gerald | Officer | Domestic violence | Grievance denied |
| Smith, Gerald | Officer | Domestic violence | Grievance granted: reinstated |
| Storm, James | Officer | Drunken driving | Settled: termination changed to resignation with pension |
| Sulpizio, Joseph | Officer | Theft: multiple allegations on-duty | Settled: reinstated |
| Summers, Rodney | Corporal | Conduct unbecoming | Grievance denied |
| Swan, Donald | Officer | Racial epithets | Settled: reinstated |
| Szustowicz, Denise | Detective | n/a | Settled: suspension reduced |
| Thomas, Cathy | Officer | n/a | Settled: reinstated |
| Thomas, Elaine | Officer | Tax fraud | Grievance denied |
| Thomas, Jerry | Officer | Neglect of duty | Settled: suspension reduced |
| Thompson, Ronald | Officer | Sex: soliciting prostitution | Settled: reinstated |
| Tilghman, Lawrence | Officer | n/a | Settled: reinstated and paid $150,000 |
| Timms, James | Officer | Domestic violence and lying | Grievance granted, ordered reinstated but failed psych exam |
| Torres, Michael | Officer | Residency clause violation | Grievance granted: reinstated |
| Truitt, Stacey | Officer | Domestic: striking child with belt | Grievance denied |
| Turk, Tracey | Officer | Asleep with gun on lap, ignoring orders | Grievance partially granted |
| Wagner, Linda | Officer | Improper call for officer assist | Grievance denied |
| Walsh, Thomas | Sergeant | Theft of time | Grievance partially granted: transfer overturned |
| Weiss, James | Detective | Domestic: stalking and lying under oath | Grievance denied |
| Whack, Dominick | Officer | False entry | Grievance denied |
| White, Quinten | Sergeant | Disobedience | Settled: suspension reduced |
| Wilson, Takeya | Officer | Drunk on duty repeatedly | Grievance denied |
| Winckler, Tyrone | Officer | Conduct unbecoming and insubordination | Settled: termination reduced to suspension |
| Winckler, Tyrone | Officer | Wrongful discharge of weapon | Grievance granted: reinstated |
| Young-Bachmeyer, Donna | Sergeant | Theft of time | Grievance partially granted: suspension upheld, restitution overturned |

- Show less

/

Case 2:17-cv-05228... Document... Filed 01/08/24... Page 25 of 85...

Case 2:17-cv-05220-KSM Document 28-1 Filed 01/03/24 Page 26 of 85

## A dart and a wall of balloons

The FOP profiles easily as the villain in stories about arbitration, given its leaders' usually unshakable defense of cops who come under scrutiny. But on a humid summer afternoon at the union's sprawling headquarters in the Far Northeast, FOP president John McNesby argued that he gets too much blame — or credit — for the union's success in arbitration hearings.

## How Some Police Discipline Cases Were Decided

Here are selected categories of alleged police misconduct in the 170 cases reviewed by The Inquirer, and how they were decided through the arbitration process. In most cases, the officer's original discipline was overturned or reduced either through a pre-hearing settlement or by an arbitrator.

| | Settled before arbitration | Discipline reduced or overturned | Discipline upheld |
|---|---|---|---|
| Disobedience/insubordination | 9 | 4 | 6 |
| Domestic incidents or violence | 5 | 7 | 5 |
| Conduct unbecoming (unspecified offense) | 10 | 3 | 2 |
| Neglect of duty | 8 | 1 | 1 |
| Assault | 2 | 2 | 2 |
| Falsified entry/statement/documents | 1 | 2 | 3 |
| Failure to supervise | 4 | 1 | 1 |
| Sexual misconduct | 1 | 2 | 2 |
| Payroll abuse | | 3 | 2 |
| Abuse of authority | 3 | | 1 |
| Racial slurs | 3 | | 1 |
| Drugs | | 3 | 1 |
| Excessive force | | 3 | 1 |
| Lying | | 2 | 1 |
| Drunkenness | 1 | | 2 |
| Residency clause violation | 1 | | 2 |

Chart: JOHN DUCHNESKIE / Staff Artist • Source: Philadelphia Police Department

## Back to work

The frequent fliers are perhaps the most troubling examples of how the arbitration system can end up repeatedly rewarding cops who have shown they don't belong on the force.

Officer Tyrone Winckler was fired in December 2014 for conduct unbecoming and insubordination, but with the FOP's support, he won his job back through arbitration on Oct. 20, 2015. Three days after returning to work, Winckler was suspended with intent to dismiss for a previous allegation involving the improper discharge of his firearm while off duty. But in December 2016, an arbitrator returned Winckler to the force again.

Court records show that in 2014 the city paid $25,000 to settle a federal lawsuit filed by Olu Afuwape, then a Penn State University student, who said Winckler inappropriately Tasered him on his neck while Afuwape was trying to break up a fight in Center City. Afuwape was not charged with any wrongdoing in that incident.

"He keeps getting rehired. Does he have to take someone's life for them to understand he shouldn't be on the force?" Afuwape asked. "How the hell this man got his job back, only God knows."

Officer Deric Lewis managed to get arrested four times — in three jurisdictions — during 12 years with the department.

Lewis, now 38, was first fired by Ramsey in 2010 after he was charged with domestic assault in Philadelphia. But he was reinstated the following year through a settlement agreement between the city and the FOP.

# EXHIBIT B

eshingle...▾

NEWS   SPORTS   BUSINESS   OPINION   POLITICS   ENTERTAINMENT   LIFE   FOOD   HEALTH   REAL ESTATE



Philadelphia Internal Affairs Lt. Raymond Saggese, deposed in a 2016 lawsuit alleging Chief Inspector Carl Holmes sexually assaulted a female officer:

**SAGGESE**

**"There's a lot of officers that are out there right now that I wish were off the force because they're criminals."**

*PLAINTIFF'S ATTORNEY CAREN GURMANKIN*

*"Is [Carl Holmes] one of them?"*

**SAGGESE**

**"And unfortunately, the legal aspects of our city and arbitration and union and all put these people back on the job."**

**GURMANKIN**
"Is he one of them?"

**SAGGESE**
"No matter how much I fight, scream, yell, beg and holler, they are still back on the job."

**GURMANKIN**
"Is he one of them that you would like to see off the force?"

**SAGGESE**
"I really can't answer that."



**SPECIAL REPORT**

# The Untouchables

Carl Holmes' alleged sexual misdeeds were well known by Philadelphia police and city officials, but a flawed system shielded him for 15 years.

By **Barbara Laker**, **David Gambacorta**, and **William Bender**

Thursday, Dec. 5, 2019



O n a frigid morning in January 2004, Elisa Diaz stood in her dress blues inside Temple University's Liacouras Center, proud and sentimental. Graduation Day had finally arrived for the Philadelphia Police Department's latest cadets. She'd grown up 125 miles away, a small-town girl from the Poconos, but moved to Philly to pursue her lifelong dream, a career in law enforcement.

Now, with Badge Number 4929 pinned below her lapel, she couldn't wait to embark on her new adventure in one of the largest police departments in the country.

As the festivities wrapped up, she introduced her parents to the inspector who oversaw training at the academy and had been supportive of her: Carl Holmes. He was a human skyscraper, 6-foot-6, close to 300 pounds, a former offensive tackle at Temple.

"We will protect her," Holmes assured her parents.

That put her mom, Patricia Diaz, at ease. Elisa was 21, the youngest in her class, and Holmes seemed like he could be trusted to look out for her.



*Courtesy Patricia Diaz*

Elisa Diaz's January 2004 graduation from the Philadelphia Police Academy was documented by her hometown newspaper, The Pike County Dispatch.

During training, Holmes told Diaz his door would always be open for her. But he also warned, without elaboration, that once assigned to a district, she might experience some "weird s—."

Diaz assumed he meant that male cops would hit on someone like her — young, slender, attractive. She figured she could tough it out and rebuff any advances; nothing would get in the way of her being a cop.

Holmes was right. Before long, one of Diaz's bosses was sexually harassing her, even showing up at her house unannounced. She grew scared.

She turned to her cadet mentor for guidance, meeting Holmes in his tiny office at the police academy and confiding her fears. In response, Holmes lifted her onto his desk,

forced his tongue in her mouth and groped her breasts, according to a recent grand jury presentment.

Diaz tried to push him off, but at 5-foot-4 and 125 pounds, she was easily overmatched. She pleaded with him to just let her go, swearing she wouldn't tell anyone. But he grabbed her chin and told her no one would believe "some little bitch."

As she struggled to break free, he bearhugged her from behind, shoved his hand down her pants, and forced a finger into her vagina.

She fled from his office and frantically dialed her mother. When Patricia Diaz answered, all she heard was the haunting sound of her daughter crying and screaming.

What happened to Diaz in 2004 has remained secret — until now. In the 15 years that her story went untold, Holmes grew more powerful, rising to the rank of chief inspector, while also allegedly assaulting two other female cops.

Holmes, now 54, and married with two daughters, wasn't some lone wolf, operating in the shadows. His alleged crimes were well known to officials in the Philadelphia Police Department, the District Attorney's Office, and City Hall.



Courtesy Philadelphia Police Department

Carl Holmes was an inspector at the police academy when he met Diaz in 2003. He assured her parents that the department would take care of their daughter.

He has long denied ever forcing himself on any female officer. But in October, District Attorney Larry Krasner charged Holmes with sexual assault and related offenses, at the recommendation of a grand jury that heard testimony from at least three of Holmes' alleged victims, including Diaz.

A deep look into Holmes' conduct, including recently obtained documents, reveals systemic flaws that shielded him and other top police officials: prosecutors reluctant to hang a case on the word of victims who delayed reporting their assaults; city officials content to look the other way, even as Holmes cost taxpayers more than $1.3 million in lawsuit settlements; and a Police Department that discounts sexual harassment complaints — especially ones filed against commanders — leaving women vulnerable to retaliation.

Holmes' history also lays bare how "broken" the city's procedures are for handling complaints of sexual misconduct, says City Controller Rebecca Rhynhart, who has called for a single, independent office to be given oversight of sexual harassment investigations involving city employees.

Nowhere were these problems more glaring than in Internal Affairs, where allegations typically come down to a rank-and-file cop's word against a boss's. Without eyewitnesses or video or audio evidence, female officers are routinely not believed.

The Fraternal Order of Police Lodge No. 5 represents each side, but mostly supports the superior officer, who knows how to offer effective defenses to Internal Affairs investigators: It didn't happen. Or: It was consensual.

And in the rare instances where punishments are doled out, they're negligible — and don't prevent commanders from collecting more promotions, amassing more power.

In fact, some longtime cops have a nickname for Holmes and Teflon bosses like him: The Untouchables.

## 'HE MOLESTED ME!'

 lisa Diaz was just 5 years old when she told her parents that she would grow up to be a cop. She was so insistent, they even took her to visit a police cadet school.

Sixteen years later, as a rookie, she was assigned to the 39th District, in the city's Hunting Park and Nicetown-Tioga sections. In June 2004, Sgt. Randy Davis became Diaz's supervisor, and asked if she was interested in starting a relationship. Taken aback, she told him no — she'd never get involved with a supervisor. Davis, according to court and police documents, asked if she considered modeling, and offered to take photos of her. He told her he could send them to Playboy.

He made her even more uncomfortable by singling her out for ride-alongs that lasted five hours. On one occasion, as she handed over her log book for his signature, Davis grabbed her hands and started kissing her neck.

She pushed him away and jumped into her patrol car.



*Courtesy Patricia Diaz*

Elisa Diaz, shown in undated photos in her Philly police uniform, turned to Holmes after she said she was harassed by her boss in the 39th District during her first year on the job. Holmes had warned her that she would encounter "weird s—" once she was assigned to a district.

Then, in August 2004, Davis showed up at Diaz's house when her parents were there, saying he just happened to be in the neighborhood. After he left, Patricia Diaz could tell her daughter was rattled, and asked: "What's going on?"

"He won't leave me alone," Diaz said. "It's a nightmare."

That night, when Diaz showed up for work, Davis accused her of associating with known drug dealers. He assigned her to a different patrol car by herself, and instructed officers to refrain from backing her up on radio calls. Davis would later deny ever sexually harassing Diaz.

Shaken, she turned to her mother for advice. Patricia Diaz suggested she see the tower of a man who promised his help at her graduation, and she agreed to go that day.

"Call me when you get out," Patricia told Elisa, "and let me know what happened."

Diaz drove to the police academy, still unsure of how to navigate the Police
Department. Holmes, by then a savvy insider, waited in his office.

He'd grown up in Mount Airy, the son of a captain in the Philadelphia Fire Department. Holmes graduated from La Salle College High School in 1983, and landed a football scholarship to Temple University.



**Page 92**                                                    PHILADELPHIA DAILY NEWS

# Temple's Holmes At End Of Line

**By MIKE KERN**
Daily News Sports Writer

Even though Carl Holmes stood 6-6 and weighed 240 five years ago as a senior lineman at La Salle High School, he failed to generate recruiting interest at any level.

So, as a last resort, he and his father took some game films to the Temple football offices in February 1983, on the day before players were allowed to sign national letters of intent.

"I basically had nothing to lose," Holmes said. "All I was really looking for was a chance to come out as a walk-on. I just wanted to show that I had a little ability. I didn't have any aspirations of getting a scholarship. I figured the worst they could say was no.

"With some guys, getting that scholarship is a status thing. I just wanted to play football, and Temple happened to be the closest school. But I never expected much to come of it."

Temple coach Bruce Arians must have been impressed with what he saw, however, because he showed up at La Salle the next day to offer Holmes a free ride. That afternoon, Holmes put his name on the dotted line at a fire station where his father — a Philadelphia firefighter who has since been promoted to captain — worked.

Now, Holmes is up to 275 pounds, and is thought to possess some pro potential. A fifth-year senior, he has started at offensive tackle for the last two seasons. Yet even today, he no

Staff Photography by Rick Bowmer
Offensive tackle Carl Holmes (79) has come a long way at Temple

*Newspapers.com, The Philadelphia Daily News*

Holmes attended Temple University on a scholarship, and starred as an offensive tackle on the school's football team. In 1987, he said he hoped the team's poor season would be the "worst thing that happens in my life."

As Temple limped through its 1987 season, Holmes told a Daily News reporter: "I hope this [losing season] is the worst thing that happens in my life, but I don't think it will be."

Holmes went on to play for the Washington Redskins, but was cut from the team's practice squad in 1988. Two years later, he joined the police force.

But some aggressiveness from Holmes' football days spilled into his new career. In the 1990s, the city had to settle three lawsuits against Holmes for physical abuse for a

total of $109,500.

In a 1992 case, Holmes was accused of brutally beating a kidney transplant recipient whom he'd caught urinating in a North Philly alley. When the man's friends told Holmes about his kidney condition, Holmes snapped, "Shut the f— up!"

Holmes denied striking the man, but Internal Affairs sustained the allegations. It recommended that he be considered for "sensitivity training, stress management and a psychological evaluation."

In a case two years later, Holmes was one of the first officers to arrive on the scene of an armed robbery at a West Philly 7-Eleven, where the suspect had set his gun on the counter to stuff money into bags. Holmes shot the man seven times, even as he lay on the ground.

When paramedics wheeled out the suspect, Holmes shouted, "Die mother f—r, die!"

---

## The kidney patient

Jerome Jackson was walking home late at night on Jan. 5, 1992, with friends Jerome Myers and William Cropper when he stopped to urinate in an alley on North 13th Street.

Jackson, then 33, had recently received a transplanted kidney. His condition made him feel the need to urinate frequently.

A Philadelphia patrol car pulled up to the alley and out stepped Officer Carl W. Holmes Jr.

Jackson told Internal Affairs investigators that Holmes — who at 6-foot-6, 280 pounds, and as a former pro-football lineman, had at least half a foot and 100 pounds on Jackson — pounced at him.

"He slammed me into the car twice and then he put me on the ground and stepped down on me," Jackson complained.

He said that because he was trying to protect his kidney, "I rolled over, and he stepped down on me, so he told me to get up on my knees. I was on my back and he stepped down on me, he stepped on my groin one time. ... I rolled to my side so that he wouldn't step on my transplant."

Jackson was held at the station for 2½ hours. No charges were filed against him.

Officer Benjamin Johnson told Internal Affairs he'd been at the scene when Jackson resisted arrest and

Holmes had to subdue him. Johnson said that from where he was standing, he could not tell if Holmes kicked Jackson, but heard Jackson ask: "Why did you kick me?" Johnson said Holmes did not grab, slap or punch anyone.

Holmes said Jackson appeared drunk and resisted arrest, so he used a "straight-arm bar takedown" — which he'd learned at the Police Academy — to put Jackson on the ground and handcuff him.

The Internal Affairs report contained these conclusions:

"The allegation that P/O Holmes slammed Mr. Jackson into a car, stepped on his groin, and kicked him while he was on the ground is sustained.

"The allegation that P/O Holmes struck Mr. Jackson, with his hand in the head area, prior to throwing him to the ground, is sustained.

"The allegation that P/O Holmes struck Mr. Myers with his hand, causing his hat to come off, is also sustained.

"The allegation that P/O Holmes verbally abused and threatened Mr. Cropper and Mr. Myers is sustained."

After the Internal Affairs report,

Commissioner Neal took direct action and suspended Holmes for 20 days. However, Holmes appealed and an arbitrator reduced the suspension to five days.

Holmes has been promoted to sergeant.

### Piled 'like football players'

Newspapers.com, The Philadelphia Inquirer

Holmes joined the Police Department in 1990. The city would have to settle three lawsuits against Holmes for physical abuse, including an episode detailed by The Inquirer in 1995.

Elisa Diaz knew none of this when she arrived at Holmes' office. She just needed advice. She explained to Holmes how miserable Davis had made her; she had

Holmes cut in. He'd known Davis for years, and they socialized together. He told Diaz it might be better if he and an Internal Affairs inspector tried to talk some sense into Davis.

He cautioned Diaz against filing an EEO complaint. "Prepare for a fight," he told her.

He told her to write a memo about her problems with Davis. When she stood up to hand him her account, Holmes moved toward her, sandwiching her between two desks. She said he grabbed her with both hands, lifted her onto a desk, and sexually assaulted her. Diaz pushed her foot off the desk, knocking something over, and when Holmes was distracted, she bolted from his office.

She called her mom from her car. "I can't believe it. I just can't believe it," Diaz cried over and over.

"What?" her mother asked. "What?"

"He molested me!"

Her mother was consumed by guilt. "I had suggested she talk to him. She would never have thought of that. I live with it today and I'll never get over it."

Holmes' attorney, Gregory J. Pagano, said his client didn't sexually assault anyone.

"We are looking forward to our day in court when we can present our very strong defense," Pagano said. "If he were not a police officer, especially a very high-ranking police officer, I firmly believe he would not be criminally charged."

As for Elisa Diaz, her suffering wouldn't end.

———

## UNOFFICIAL PAYBACK

y September 2004, the stress from Davis' ongoing harassment and Holmes' assault pushed Diaz to her breaking point. She needed to file an EEO complaint.

Could she blow the whistle on both Davis and Holmes?

Diaz mulled her options. She worried that no investigator would believe that two supervisors had subjected her to such horrific treatment. "They would say she was a crazy girl accusing men of everything," her mom would later explain.

She decided to only mention Davis in her seven-page complaint. The story of what Holmes had done to Diaz would remain secret.

An officer in the police EEO unit began investigating Diaz's complaint.

A few weeks later, Internal Affairs received an anonymous letter that said Diaz hung out with drug dealers. Then drugs were found abandoned in her trash can outside her home. Internal Affairs cops confiscated her gun and took her off the street.

She was soon transferred to the 35th District, where the captain stuck her with guarding sick or injured prisoners outside their hospital room. The captain told her that he didn't trust her, or want her around male cops.

Many female cops have shared similar stories over the years, in lawsuits and news reports, of being ostracized or detailed to undesirable assignments after they complained about harassment — unofficial payback.

The EEO officer wrote that Davis "did sexually harass Officer Elisa Diaz" but found the most serious complaints against Davis to be inconclusive, citing a familiar refrain: Davis denied the allegations, and there was no corroboration of Diaz's account.

> **ABOUT THE REPORTING**
> This story is based on hundreds of pages of court documents, deposition transcripts, and police records obtained by The Inquirer, as well as recent interviews with former Police Commissioner Charles H. Ramsey; former District Attorney Lynne Abraham; former Deputy Mayor for Public Safety Everett Gillison; former Assistant District Attorney Deborah Harley; former police Sgt. Randy Davis; Patricia Diaz; more than 25 sources who are familiar with the case, but not permitted to speak about it on the record; past interviews with Christa Hayburn; David Hayburn; Keisha Johnson; Danielle Vales; former Police Commissioner Sylvester Johnson; the late former Police Commissioner John Timoney.

The Police Department found no evidence that Diaz associated with drug dealers.

Davis was demoted, transferred, and suspended for 10 days. He filed a grievance through the FOP. During an arbitration hearing, the union sided with Davis — saying he has a "proven record of integrity," and "his professional life has been ruined" — and vilified Diaz.

"The simple and inescapable fact of the matter is that Elisa Diaz is a self-centered, immature and inexperienced person who basically believes that the world should revolve around her," wrote Thomas G. McConnell Jr., the arbitrator, describing the union's position.

McConnell ordered the city to rescind Davis' suspension, demotion and transfer. He returned to the 39th District with full back pay. (Now a criminal justice professor at

Valley Forge Military Academy & College, Davis says he never harassed Diaz.)

Diaz's career, meanwhile, was over.

---

## ANOTHER VICTIM, A MUTED RESPONSE

 olmes was transferred in 2005 to the East Division, which encompasses parts of North Philly and Kensington. Among the officers he encountered there was Christa Hayburn, a patrol cop in the 25th District.

A year later, Holmes invited Hayburn — who'd been on the force for five years — to join a task force of plainclothes officers assigned to high-crime areas. Hayburn, then 30, was flattered. "I mean this was quite an honor," Hayburn would later say, "and I looked up to him as a mentor."

On Jan. 6, 2006 — three days after Hayburn began the new assignment — the team attended a farewell party for Holmes, who was leaving for a three-month FBI training program.

That night, Hayburn steered her car down a desolate stretch of Luzerne Street in Juniata, past some low-slung warehouses, until she arrived at the Philly Empire Lounge.

After mingling with other cops for a while, Hayburn stepped outside without her coat to take a phone call.


*Kylene Clever/Leave It To Me Photography*
Christa Hayburn was working as a cop in the 25th District in 2006 when Holmes, then an inspector, recruited her to join a special task force. She looked up to him as a mentor, and accepted the offer.

Holmes appeared at her side, and led her across the street. "He pulled me in for a kiss, put his arm around me, and told me how much he thought that there was a mutual attraction," Hayburn would later say.

Hayburn, petite, with brown hair, tried to think of a way to extricate herself. She told Holmes she was cold, and persuaded him to go inside.

She darted into the bathroom and called Rollie Ramos, a friend who was also a cop, and asked: How could she slink out of the club without Holmes seeing her?

Hayburn was still on the phone when suddenly Holmes opened the bathroom door. "Don't forget to tell me when you're leaving for the night," he said.

A few minutes later, she rushed out of the bathroom, grabbed her jacket and keys, and hurried to her car.

She didn't move fast enough.

Holmes called her name. He pulled her out of her car, and led her into his white city-issued Dodge Durango. He started kissing Hayburn — harder this time — and touched her breasts and rubbed between her thighs.

"'This isn't right," she told him. "I got to go, my husband's waiting for me."



*DAVID MAIALETTI / Staff Photographer*

Hayburn, photographed during a 2012 interview with Philadelphia Daily News, claimed she was assaulted by Holmes in 2006, after she attended a farewell party for him along with other cops in her unit. She was afraid to report her assault to Internal Affairs.

In a motion that mirrored Elisa Diaz's assault, Holmes shoved his right hand down the back of Hayburn's pants, she said, and then forced his finger into her vagina. Holmes pulled out his penis and placed Hayburn's hand on it.

"I have to go," she pleaded. "This isn't right. You're my boss."

He tried to push her face toward his penis. "I said no," she'd later recall. "You know, he asked me to just finish him off, because he was leaving and wouldn't be back for three months, and that it would only take a few minutes." Holmes ejaculated.

Hayburn fled to her car. She tried to drive away, but began sobbing uncontrollably. She called Ramos, who met her. "I feel so sick," she told him repeatedly.

She told him of the assault. At home, she repeated the story to her husband, who asked

"I'm too scared to report it," she told him.

For the next two years, Holmes cast a shadow over Hayburn's life. He was part of the Police Department's upper echelon, and had been featured in an alumni magazine for Widener University's School of Law, where he'd obtained a law degree in 2003. She was just a cop.

But by February 2008, Hayburn had had enough. She marched into Internal Affairs' headquarters in the Far Northeast and handed in a complaint form that detailed her assault.



*Kylene Clever/Leave It To Me Photography*

Hayburn filed a complaint with Internal Affairs in 2008. Her account of the assault she allegedly suffered at Holmes' hands in 2006 was corroborated by her husband, and another Philly cop. Internal Affairs did not sustain her complaint.

Two investigators interviewed Hayburn, her husband, Ramos and nearly three dozen cops, including some who weren't even at Holmes' party. "She had no reason to lie," a veteran police official familiar with the investigation would later recall. "I completely believed her."

Two weeks after Hayburn filed her complaint, she met Deborah Harley, the then-chief of the Family Violence and Sexual Assault Unit in the District Attorney's Office. Hayburn would later claim that Harley told her that she "didn't say no enough" during her encounter with Holmes. (Harley, contacted recently by reporters, insisted she never said that.)

The DA's Office then sent a letter to the Police Department stating that the office wasn't going to press charges against Holmes. That decision was reached without a

prosecutor questioning Holmes, because of a 1967 U.S. Supreme Court decision that protected public employees from incriminating themselves in an investigation.

When Internal Affairs investigators did finally interview Holmes a month later, he admitted that he'd told Hayburn at the party that he was attracted to her and kissed her in his Durango. "I posed the question as to what she wanted to do," he said, "[and] as I said, she mentioned the fact that she met my wife and child earlier. I took that as a no."

Holmes denied attempting to force her to have sex with him, and insisted that he never used his rank to coerce a female cop into having a relationship or liaison with him.

But a forensic team found semen stains in Holmes' Durango. How could he explain that?

Holmes claimed that another woman had been in his SUV. "I did receive oral sex from this civilian female sometime in the summer of 2007," he said. "I had sexual intercourse with the same woman outside of the vehicle and then she got back inside the vehicle."

Internal Affairs investigators didn't ask Holmes for the woman's name, address or whether their encounters were consensual. His uncorroborated explanation was accepted as fact.

Hayburn's complaint, in contrast, was backed up by her husband and Rollie Ramos, whom she told at the time, but Internal Affairs dismissed it as not sustained.

At that time, one of the top commanders in Internal Affairs was Jerrold Bates, who also oversaw EEO complaints within the department.

A few years later, Bates was accused by his aide, Keisha Johnson, in a lawsuit of coercing her into a sexual relationship. Bates admitted during a deposition that, without Johnson's permission, he'd sent naked photos of her — including one of him ejaculating on her — to a police captain who was "my buddy."

# INFERNAL AFFAIRS

Commish, D.A. to take thorough look into high-ranking cop's conduct

BY BARBARA LAKER
& DAVID GAMBACORTA
*Daily News Staff Writers*

POLICE COMMISSIONER Charles Ramsey has asked an outside law firm to investigate the conduct of one of the department's highest-ranking officers.

The *Daily News* this month reported that the officer, Staff Inspector Jerrold Bates, allegedly coerced former aide Keisha Johnson into a sexual relationship to keep her job.

The District Attorney's Office also has launched a probe to determine whether Bates should face criminal charges, Ramsey said.

Bates is a former top supervisor in the police Internal Affairs Bureau, which investigates complaints against police officers. He was also the bureau's Equal Employment Opportunity Officer in charge of investigating abuse, harassment and discrimination complaints within the department.

Ramsey this week ordered Internal Affairs to review any EEO complaints that



'WHO WAS GOING TO TELL?'

Bates had deemed unfounded, after the *Daily News* raised questions about Bates' handling of cases.

"We'll look at all of them, just to make sure we don't have any issues," Ramsey said.

Bates had a history of alleged domestic violence well before Johnson filed her com-

*Continued on Next Page*



**Staff Inspector** Jerrold Bates: The police commissioner is looking into any complaints that Bates deemed unfounded. LARISA CESTEPLON / STAFF PHOTOGRAPHER

*Newspapers.com, The Philadelphia Daily News*

One of the top commanders in Internal Affairs at the time of Hayburn's complaint was Jerrold Bates, a staff inspector. He was accused in 2012 of coercing a female aide into a sexual relationship. Bates still works for the Police Department.

"That's what friends, guys, girls [do], they exchange pictures quite frequently," Bates said.

The city hired a law firm to investigate Johnson's claims, but refused to make the findings public, even after settling with her in 2015 for $125,000.

Bates, meanwhile, is still a staff inspector, assigned to the audits and inspections unit.

Then-Commissioner Charles H. Ramsey demoted Holmes in 2008 to captain, but not based on Hayburn's account. Rather, in a memo, Ramsey wrote that receiving oral sex in a city-issued vehicle was "unacceptable" for a police executive. He considered firing Holmes, but took into account his service to the city.

The FOP filed a grievance on Holmes' behalf. His demotion was reduced in 2010 to a 30-day suspension as part of a settlement between the union and the city. Two years later, Holmes was promoted to chief inspector.

# Inspector's demotion confirmed by Ramsey

A probe into alleged sexual misconduct appears related to Carl W. Holmes Jr.'s reduction to captain.

**By Andrew Maykuth and Barbara Boyer**
INQUIRER STAFF WRITERS

A rising star in the Philadelphia Police Department has been demoted following an Internal Affairs investigation into allegations that he had forced sexual contact with a subordinate two years ago.

Commissioner Charles H. Ramsey confirmed that on Thursday, he demoted Inspector Carl W. Holmes Jr., 42, a 17-year police veteran, to captain. Lt. Frank Vanore said the demotion was based on conduct unbecoming an officer.

Holmes' attorney, Wadud Ahmad, said yesterday that Holmes met with Ramsey on Thursday. He said his client did not violate the law.

"He was cleared of any wrongdoing in terms of any alleged sexual misconduct," Ahmad said.

Holmes, who has a law degree, is a former offensive lineman at Temple University and played with two NFL teams. He had a meteoric police career, and was appointed inspector in 2002 and commander of the East Patrol Division.

In his new post, Holmes will command South Division detectives. His name was conspicuously absent from a list of 42 commanders whose new assignments were announced Thursday.

The demotion includes a 12 percent cut in the inspector's $89,500 salary. John J. McNesby, president of Fraternal Order of Police Lodge 5, said the union would appeal and take it to arbitration.

"We're confident that the demotion will be knocked down and Carl Holmes will be back in the department as an inspector," McNesby said.

Holmes was relieved of his East Division command in February and assigned to desk duty after a uniformed officer alleged that he forced her to commit a sex act in his department-issued SUV after a party in early 2006. Internal Affairs impounded his vehicle.

The woman did not immediately report the incident because she feared retaliation, sources said. The Inquirer was unable to reach her.

Ahmad questioned why allegations about a two-year-old incident were made only weeks after Holmes achieved a top score in the Civil Service examination and was first in line to be promoted to chief inspector, the department's highest Civil Service position.

"The real story is who broke that story and what are their motivations," Ahmad said. "There can only be one reason, to make his image not look so stellar."

Holmes has served on the board of trustees of La Salle College High School, from which he graduated in 1983. He did not return a telephone message left at his home Thursday.

Contact staff writer Andrew Maykuth at 215-854-2947 or amaykuth@phillynews.com.

*Newspapers.com, The Philadelphia Inquirer*

In 2008, then-Police Commissioner Charles H. Ramsey demoted Holmes — not for assaulting Hayburn, but for having admitted that he received oral sex from a woman in his city-issued Dodge Durango.

Holmes' brief punishment came at a time when then-Mayor Michael Nutter was marking a "new day" for city government — one where corruption and abuses of power would supposedly no longer be tolerated.

More than a decade later, Ramsey would argue that because the Police Department's disciplinary code didn't prohibit cops from having sex in their city cars, demoting Holmes seemed like his only recourse. "That's just the reality of it," he said. "... Once [the DA's Office] declined to pursue charges, it quite frankly limits your options in terms of any discipline."

"We demoted him. I don't think that was nothing," Everett Gillison, who at the time was Nutter's deputy mayor for public safety, would later recall.

But why didn't the DA's office press charges?

Former District Attorney Lynne Abraham, a self-described advocate for sexual assault survivors, wrote in a recent email to The Inquirer that it was "an outrage that Carl Holmes was permitted to be a sexual predator by the same institution that is supposed to 'serve and protect.'"



STEPHANIE AARONSON / File Photograph

Under then-District Attorney Lynne Abraham, the DA's Office declined in 2008 to press charges against Holmes for assaulting Christa Hayburn. Abraham would later argue that Hayburn had waited too long to file a complaint.

But Abraham also contended that Hayburn's two-year delay in filing a complaint had been problematic.

"Hayburn ... knew if she tried to bring a criminal charge against Holmes, her career in the PPD would be over. That is why she never complained until it was virtually too late," Abraham wrote. "Too bad."

Pennsylvania's statute of limitations for reporting sexual assault, however, is 12 years, plus an additional eight years if the assault is perpetrated by a "public officer."

Abraham also claimed that Hayburn had received a settlement from the city, and theorized that a defense lawyer could have argued that Hayburn "was only in it for the money," or that she was "a person of loose morals" because she was married and at a bar at night.

Hayburn, however, never received money from the city.

And she wasn't the only woman to talk to Internal Affairs in 2008 about Holmes.

## THE MAN AT THE BAR



n March 20 — almost three weeks before Holmes was interviewed about Christa Hayburn's claims — Internal Affairs investigators met a 37-year-old Chestnut Hill woman who had her own disturbing story.

She told investigators that one night in 2006, she went to Tavern on the Hill on Germantown Avenue, and ordered a drink at the bar.

A man soon wedged himself into the chair next to her. He was tall, black, had a mustache, and wore wire-rim glasses.

She left her drink on the bar and went to the bathroom. When she returned, she suddenly felt unwell, and headed to the restroom again. When she came back, her keys — which she had left on the bar — were missing.

The man sitting next to her offered her a ride home. She declined. She started to walk to her house, a block and a half away.

Within moments, she realized that the man from the bar was slowly following her in a large, white SUV. He rolled down the window, and implored her to get in. Terrified, she rushed into her house and told her husband what happened. He looked outside, but the SUV was gone.

The couple didn't report it at the time. "I really should have," the woman told investigators, "but I didn't."

A few weeks later, the woman and her husband were at a nearby bar when she noticed a large guy walk in — the same one who'd followed her home from the Tavern. A bartender later told the couple that the man with the mustache was a high-ranking cop.

The Internal Affairs investigators presented the woman with a photo lineup of eight police officers, all of whom were black, had mustaches, and wore glasses. She circled the face of the one she recognized.

It was Carl Holmes.

Questioned about the woman's account, Holmes told Internal Affairs that he'd been at the Tavern, and remembered a woman who lost her keys. But he hadn't followed her.

The woman's allegations didn't result in any action.

Meanwhile, Holmes' unusual behavior would continue to raise concerns at several bars in Chestnut Hill and Mount Airy.

"Creepy."

"Uncomfortable."

"Bad vibes."

These are the words of bartenders and owners in the area who described having watched Holmes walk in and survey their establishments for women who were alone. If he didn't find any, he might leave without buying a drink. Sometimes, Holmes just peered in the window.

One bar owner said she even posted a photo of Holmes as a warning for employees to be on the alert if he came through the door.

---

## A MILLION DOLLAR ASSAULT?

 ichele Vandegrift came from a family of Philadelphia cops — her father, Thomas Lauf, was a detective, and her brother, Brian Lauf, was a patrol officer.

In 2004, at the age of 22, Vandegrift joined the police academy, and met a guy her father had mentioned fondly in old stories he shared: Carl Holmes.

"My dad thought the world of him. He thought the world of my dad, which was so touching to me," she'd later recall. "He was like an uncle type."

After she graduated, Vandegrift was assigned to the 24th District, in East Division, where Holmes was the inspector.

In 2006 — the same year that Holmes promoted Christa Hayburn — Vandegrift noticed that Holmes was paying close attention to her around the office. At first, it seemed harmless.

But then he began calling Vandegrift, too, saying he fantasized about her. "I would love to bend you over," Holmes told Vandegrift.

She laughed, embarrassed. She wondered if rejecting Holmes could hurt her career. "This man has strong sexual feelings, and he's aggressive with it and what am I going to do? ... He's the boss of my captain, my lieutenant, my sergeant, my corporal. He's the top guy."



*Handout*

Michele Vandegrift, who settled a lawsuit with the city for $1.25 million, said Carl Holmes sexually assaulted her in his office. The head of Internal Affairs did not forward the case to the District Attorney's Office.

Vandegrift was working an overnight shift in early 2007 when Holmes summoned her to his office. She walked to the second floor with a sense of dread. Holmes was at his desk, wearing an Eagles jersey and smoking a cigarette. He made small talk at first, then commented on her thighs. He walked toward her.

"I want to know how wet you are," he said.

Vandegrift would later say she felt like "a deer in headlights," unable to move as Holmes inched closer. He shoved his hand down her pants, and pushed a finger into her vagina.

"He pulled his hand out and tasted his finger," Vandegrift would later tell an Internal Affairs investigator, "and said it tasted good."

She stumbled out of his office.

Vandegrift, like Hayburn and Diaz before her, didn't know what to do. She, too, tried to bury the trauma of the assault, only to find that it became overwhelming.

In 2014, she filed an EEO complaint that outlined multiple years' worth of sexual harassment that she said she'd suffered at the hands of male colleagues, including not only Holmes but an inspector named Anthony Washington.



ELIZABETH ROBERTSON / Staff Photographer

Inspector Anthony Washington was given oversight of the police Special Victims Unit in December 2018, even though he'd been accused in the past of sexually harassing female cops and a local college student.

Like Bates and Holmes, Washington had been the subject of news coverage for the way he allegedly treated women. At least four female cops and a female Temple University student had accused him of sexual harassment, and the city had spent $198,000 to settle five lawsuits against him.

And Washington, too, continued to be promoted, eventually overseeing the department's Special Victims Unit for nearly a year, despite outcry from advocates for

sexual assault victims.

Vandegrift would be shunned by her male peers and transferred to less desirable posts.

She would later say that male cops grouped female officers into three categories: the "female that complains, the rat, the one who breaks the code of silence, the one you cannot trust. You're a whore; you just f— everybody. You're a lesbian; you're butch."

Internal Affairs Lt. Raymond Saggese, assigned to investigate Vandegrift's allegation about Holmes, would later claim he didn't know about Hayburn's case specifically, but was aware Holmes had previously been accused of sexual misconduct.

Saggese recommended that Vandegrift's case be forwarded to the District Attorney's Office for review, only to be overruled by his boss, Chief Inspector Chris Flacco. "He denied it," Saggese would explain.

(Flacco declined to comment.)

In 2016, Vandegrift sued the city alleging she had been subjected to "gross, degrading, and systematic sexual harassment."

That November, Holmes walked in the Center City office of Vandegrift's attorney, Steve Console. Dressed in full police regalia, he was deposed for three hours.

Console hit Holmes with questions that were tougher than he'd faced from Internal Affairs. He asked Holmes to identify the mystery woman from the Chestnut Hill encounter that led to the semen stains in his Durango.

"To the best of my knowledge, the woman's name was Denise," he finally said.

Holmes testified that he had met her at a Northwest Philadelphia bar, and got together with her eight to 10 times for future sexual encounters, sometimes at her home. But he claimed he didn't know the woman's last name, phone number, or address.

The city would settle Vandegrift's case for $1.25 million in March 2017.

A federal judge who oversaw the case wrote in a memo that Vandegrift "has provided sufficient evidence for a reasonable jury to conclude the City knew of its specific problems with sexual assault and harassment in the police department … but did nothing to stop such conduct."

The city attempted to silence Vandegrift by inserting a nondisclosure clause in her settlement agreement.

A year later, in one of his first moves as the city's new district attorney, Larry Krasner overhauled the way his office investigated public corruption, including police misconduct.

Under his predecessors, sexual assault cases involving police officers were handled by the Family Violence and Sexual Assault Unit, whose prosecutors regularly worked side-by-side with police officers. To avoid potential conflicts, police cases would be handled by a separate Special Investigations Unit.

Prosecutors in the new unit began combing through documents attached to the Vandegrift case, and were startled.

"Everybody knew," a source familiar with the Holmes investigation said of his alleged crimes, "and nobody did anything."

That would soon change.

## TUMBLING DOMINOES

**E** lisa Diaz became a shell of her former self in the aftermath of her assault.

She developed post-traumatic stress disorder, major depressive disorder, severe anxiety, and insomnia. She saw a psychiatrist who prescribed medications.

Diaz stayed on the police force, but suffered a knee injury during a foot pursuit that required surgery. The department said she didn't seek an extension of her medical leave, and fired her for not returning to work.

She moved back to her parents' home in Pike County. Diaz cut off her long, brown hair, sported a red mohawk, and got tattoos all over her body.

"She'd lost everything. She came home with nothing. No job. No place to live. No nothing," her mother would recall.



*Courtesy Patricia Diaz*

Elisa Diaz was fired from the Police Department after suffering a knee injury while on the job. She returned to Philadelphia for the first time earlier this year to testify in front of a grand jury that was investigating Carl Holmes.

In 2018, Diaz happened across news articles about Holmes, and discovered that he had been accused of assaulting other female cops. She contacted Christa Hayburn on Facebook.

Diaz apologized to Hayburn; she believed that if she had spoken out in 2004 about what Holmes had done, Hayburn might have been spared from her 2006 assault. She still carries the guilt.

"This is not your fault," Hayburn would assure Diaz. "Don't hold it in your heart."

Earlier this year, in April, a detective in the District Attorney's office called Hayburn and said city prosecutors were investigating Holmes. She immediately connected the detective with Diaz.

The DA's Office empaneled an investigating grand jury. Over the summer, Diaz, Hayburn, and Vandegrift each testified before the grand jury's 30 members.

It was torturous. Vandegrift told the jurors that she didn't want them to see her as a victim; she'd always tried to be strong. "I'm struggling with my life," she said.

While the grand jury was digging into Holmes' case, the city was stunned by the Aug. 20 resignation of Police Commissioner Richard Ross, who was accused in a lawsuit of retaliating against a female cop who had ended their affair.

Ross denied the woman's claims. But to many observers, his sudden resignation proved that a culture of misconduct leached throughout the entire department, even up to the commissioner's office.

He wouldn't be the last domino to fall.

The grand jury concluded that the vivid, horrific allegations described by Diaz, Hayburn, and Vandegrift more than met the standard for criminal charges, and recommended that Krasner's office indict Holmes. "... No one, no matter position, rank, or power, is above the law," its members wrote in their presentment.

On Oct. 23, detectives told Holmes to report to Internal Affairs by 8 a.m. the next day. He arrived, looking tired and worn, in plain clothes with an attorney at his side.

This time, he couldn't talk his way out.

Holmes was charged with eight offenses, including aggravated indecent assault and attempted involuntary deviate sexual intercourse. He was suspended for 30 days with the intent to dismiss.

He surrendered his badge and gun. A cop drove the handcuffed Holmes in a wagon to a detention unit inside police headquarters at Eighth and Race Streets, a building he used to regularly traverse in uniform.



*Philadelphia Police*

Carl Holmes was arrested in late October and charged with aggravated indecent assault without consent and seven other charges, which could bring him more than 50 years in prison if he's convicted.

The next afternoon, he posted 10 percent of his $850,000 bail. On Nov. 8, he retired, allowing him to collect a monthly pension of $7,607.

Holmes has a preliminary hearing set for Jan. 16; the FOP has declined to defend him. In the meantime, he's living in a four-bedroom home with a wrought iron fence, worth more than $500,000, in a quiet, leafy section of Roxborough.

If he goes to trial and is found guilty, Carl Holmes — once an Untouchable — could face up to 50 years behind bars.

The Inquirer's investigative reporting is supported in part by The Lenfest Institute's Investigative News Fund. Editorial content is created independently of the Fund's donors. A listing of Lenfest Institute donors can be found at lenfestinstitute.org. Gifts to support the Investigative News Fund can be made at www.inquirer.com/donate.

This story is based on hundreds of pages of court documents, deposition transcripts, and police records obtained by The Inquirer, as well as recent interviews with former Police Commissioner Charles H. Ramsey; former District Attorney Lynne Abraham; former Deputy Mayor for Public Safety Everett Gillison; former Assistant District Attorney Deborah Harley; former police Sgt. Randy Davis; Patricia Diaz; more than 25 sources who are familiar with the case, but not permitted to speak about it on the record; past interviews with Christa Hayburn; David Hayburn; Keisha Johnson; Danielle Vales; former Police Commissioner Sylvester Johnson; the late former Police Commissioner John Timoney.





THE INQUIRER

Digital Edition
Subscriber Services

THE DAILY NEWS

Digital Edition
Subscriber Services

© 2020 The Philadelphia Inquirer, LLC   Terms of Use   /   Privacy Policy

# EXHIBIT C

Philly cop charged with sex assault on minor

# The Inquirer



NEWS    SPORTS    BUSINESS    OPINION    POLITICS    ENTERTAINMENT    LIFE    FOOD    HEALTH    REAL ESTATE

# Philly cop charged with sex assault on minor

by Robert Moran, Updated: January 22, 2021



TYGER WILLIAMS / STAFF PHOTOGRAPHER



A 40-year-old Philadelphia police officer was arrested Friday for an alleged sexual assault on an underage female, the department said.

Rahim Montgomery, who has been on the force for 20 years and most recently was assigned to Center City, has also been suspended for 30 days, and afterward will be dismissed, the department said.

Montgomery was arrested following an Internal Affairs investigation of a complaint reported in July of an alleged sex assault that occurred about five years ago, when the female was a minor.

He was charged with unlawful contact with a minor, indecent assault, indecent exposure, and corruption of minors.

Montgomery could not be reached for comment.

John McNesby, president of the police officer's union in Philadelphia, the Fraternal Order of Police Lodge 5, declined to comment.

---

**INQUIRER MORNING NEWSLETTER**

Get the news you need to start your day

your@email.com

| Sign Up |

Montgomery's name appeared on a list maintained by former District Attorney Seth Williams of "problem" cops. The list was published by the Inquirer in 2018.

Montgomery, "while off-duty, destroyed property inside his home and assaulted his spouse," according to the description that appeared on the list. It said Montgomery had been "[f]ound guilty of unspecified conduct unbecoming" and punished with a 10-day suspension.

While some current and former officers on the list were flagged as problematic for testifying in court, Montgomery received no such designation.



Posted: January 22, 2021 - 6:10 PM
Robert Moran | @RobertMoran215 | bmoran@inquirer.com

**Editor's Note**

The Inquirer does not host comments on most stories. **Here's why**.

# We Recommend

**More Philly lawyers are on Trump's impeachment defense team and one sued the president last year**
Jeremy Roebuck and Anna Orso

**CDC study finds two masks are better than one; Pa. aims to vaccinate general public by summer; Murphy defends smokers being vaccinated before teachers**
Rob Tornoe, Marie McCullough and Allison Steele

**HBO sets premiere for Kate Winslet show that was filmed in Philly suburbs**
Ellen Gray

**CDC study finds two masks are better than one vs. COVID-19**
Mike Stobbe, Associated Press

**Pennsylvania residents are more worried than ever about health care costs**
Sarah Gantz

**Think Philly's FOP 'accountability' bonus makes no sense? Not in this upside down world. | Helen Ubiñas**
Helen Ubiñas

TWITTER                    FACEBOOK                    INSTAGRAM

NEWS & INFO

News  /  Sports  /  Entertainment  /  Business  /  Health  /  Food  /  Life  /  Opinion  /  Archives  /  Special Reports

ABOUT US

About The Philadelphia Inquirer  /  Advertise  /  Contact Us  /  Licensing & Permissions  /  Photo Reprints  /  Newspapers in Education  /

MARKETPLACE
Jobs & Internships  /  Inquirer Events  /  Acel Moore Workshops  /  Newsroom Staff

Inquirer Store  /  Find a Home  /  Job Listings  /  Special Sections  /  All Classifieds  /  Gift Subscriptions

MOBILE APPS

Inquirer News  /  Philly Sports Now





THE INQUIRER                                          THE DAILY NEWS

Digital Edition                                        Digital Edition
Subscriber Services                                    Subscriber Services

The Philadelphia Inquirer

© 2021 The Philadelphia Inquirer, LLC  /  Terms of Use  /  Privacy Policy  /  California Notice
California residents do not sell my data request

# EXHIBIT D

# The Inquirer

NEWS   SPORTS   BUSINESS   OPINION   POLITICS   ENTERTAINMENT   LIFE   FOOD   HEALTH   REAL ESTATE

# Philly cop arrested for allegedly violating court protection order

by **Robert Moran**, Posted: February 4, 2021



ALEJANDRO A. ALVAREZ / STAFF PHOTOGRAPHER



A 32-year-old Philadelphia police officer was arrested Thursday on suspicion of violating a protection-from-abuse order, the department said.

Ahmad Abuali, a six-year member of the force who most recently was assigned to the 19th Police District in West Philadelphia, was charged with one count of violating the order on Saturday.

Police Commissioner Danielle Outlaw has suspended Abuali for 30 days with intent to dismiss, the department said.

No other details were released about the order or the alleged violation.

Online court records show Abuali was released late Thursday afternoon on his own recognizance and his next court appearance was scheduled for Feb. 18.

A spokesperson for the union representing city police officers said there would be no comment.

**INQUIRER MORNING NEWSLETTER**

Get the news you need to start your day

your@email.com

**Sign Up**



Posted: February 4, 2021 - 7:04 PM

**Robert Moran | @RobertMoran215 | bmoran@inquirer.com**

**Editor's Note**

The Inquirer does not host comments on most stories. **Here's why**.

## We Recommend

**Biden orders sanctions against Myanmar after military coup**

Aamer Madhani and Jonathan Lemire, Associated Press

**Pennsylvania residents are more worried than ever about health care costs**

Sarah Gantz

**More Philly lawyers are on Trump's impeachment defense team and one sued the president last year**

Jeremy Roebuck and Anna Orso

**CDC study finds two masks are better than one; Pa. aims to vaccinate general public by summer; Murphy defends smokers being vaccinated before teachers**

Rob Tornoe, Marie McCullough and Allison Steele

**HBO sets premiere for Kate Winslet show that was filmed in Philly suburbs**

Ellen Gray

**CDC study finds two masks are better than one vs. COVID-19**

Mike Stobbe, Associated Press



TWITTER     FACEBOOK     INSTAGRAM

NEWS & INFO

News / Sports / Entertainment / Business / Health / Food / Life / Opinion / Archives / Special Reports

ABOUT US

About The Philadelphia Inquirer / Advertise / Contact Us / Licensing & Permissions / Photo Reprints / Newspapers in Education /

Inquirer Store / Find a Home / Job Listings / Special Sections / All Classifieds / Gift Subscriptions

MOBILE APPS

Inquirer News / Philly Sports Now



THE INQUIRER

Digital Edition
Subscriber Services

THE DAILY NEWS

Digital Edition
Subscriber Services

The Philadelphia Inquirer

© 2021 The Philadelphia Inquirer, LLC   Terms of Use  /  Privacy Policy  /  California Notice
California residents do not sell my data request

# EXHIBIT E

Philly police officer arrested for 2019 incident, department says

# The Inquirer



NEWS   SPORTS   BUSINESS   OPINION   POLITICS   ENTERTAINMENT   LIFE   FOOD   HEALTH   REAL ESTATE

# Philly police officer arrested for 2019 incident, department says

by Robert Moran, Posted: January 13, 2021



TYGER WILLIAMS / STAFF PHOTOGRAPHER



A 30-year-old Philadelphia police officer has been arrested for an unspecified vandalism incident that happened in late 2019, a department spokesperson said Wednesday.

Ryan Perez, a five-year member of the force who was assigned to the 25th District in North Philadelphia, was charged with public drunkenness, criminal mischief, and two counts of disorderly conduct for an incident that occurred on Dec. 7, 2019, said department spokesperson Sgt. Eric Gripp.

Commissioner Danielle Outlaw has suspended Perez for 30 days with intent to dismiss, Gripp said.

Police did not immediately release any other details about the case, which was investigated by the Internal Affairs Division.



Posted: January 13, 2021 - 6:21 PM

**Robert Moran | @RobertMoran215 | bmoran@inquirer.com**

**INQUIRER MORNING NEWSLETTER**

Get the news you need to start your day

| your@email.com | **Sign Up** |

**Editor's Note**

The Inquirer does not host comments on most stories. **Here's why**.

# We Recommend

**With seven killed in 24 hours, Philly confronts a startling rise in homicides**

Vinny Vella and Mensah M. Dean

**Philly receives $2.3 million grant to continue working to reduce its jail population**

Chris Palmer and Samantha Melamed

**Philly police contract fight is on: FOP seeks 5% 'accountability' bonus for body cam use**

Samantha Melamed

**Allegedly drunk Philly cop left woman with broken legs, dead dog after crashing car into her home at 70 mph**

Barbara Laker, William Bender and David Gambacorta

**Philly cop charged with DUI after crashing into a house, injuring two occupants and killing a dog**

Rita Giordano

**Woman and man fatally shot at Philly rooming house**

Diane Mastrull



TWITTER      FACEBOOK      INSTAGRAM

NEWS & INFO

News / Sports / Entertainment / Business / Health / Food / Life / Opinion / Archives / Special Reports

ABOUT US

MARKETPLACE
Philadelphia Inquirer  /  Advertise  /  Contact Us  /  Licensing & Permissions  /  Photo Reprints  /  Newspapers in Education  /

Inquirer Store  /  Find a Home  /  Job Listings  /  Special Sections  /  All Classifieds  /  Gift Subscriptions

Jobs & Internships  /  Inquirer Events  /  Acel Moore Workshops  /  Newsroom Staff
MOBILE APPS

Inquirer News  /  Philly Sports Now



THE INQUIRER

Digital Edition
Subscriber Services

THE DAILY NEWS

Digital Edition
Subscriber Services

The Philadelphia Inquirer

© 2021 The Philadelphia Inquirer, LLC   Terms of Use  /  Privacy Policy  /  California Notice
California residents do not sell my data request

# EXHIBIT F

# The Inquirer



NEWS　SPORTS　BUSINESS　OPINION　POLITICS　ENTERTAINMENT　LIFE　FOOD　HEALTH　REAL ESTATE

# Former Philly police officer charged with murder in 2017 shooting of an unarmed Black man

by **William Bender**, **Mensah M. Dean** and **Chris Palmer**, Updated: October 9, 2020



COURTESY OF FAMILY



A former Philadelphia police officer was charged Friday with murder in the death of an unarmed Black man on an East Germantown sidewalk.

Officer Eric Ruch Jr. shot 25-year-old Dennis Plowden Jr. following a high-speed car chase in December 2017.

**RELATED STORIES**

- **Widow of unarmed man slain in 2017 by now-fired Philly cop files lawsuit (from 2019)**

Ruch fired one bullet through Plowden's upraised hand that tore into his head, according to a grand jury presentment. Plowden, sitting on a sidewalk, did not have a weapon.

Following an internal investigation of the shooting, Ruch, who had been an officer for 10 years, was terminated from the police force in October 2018. The criminal investigation took another two years to conclude, partially due to delays caused by the coronavirus pandemic.

Ruch, 33, who lives in Upper Bucks County, was charged with first-degree murder, third-degree murder, voluntary manslaughter, and possession of an instrument of crime. He turned himself in Friday morning.

His lawyer, Fortunato Perri Jr., said, "We're confident that the evidence will prove that Officer Ruch was legally justified in the use of force under the circumstances."

**INQUIRER MORNING NEWSLETTER**

Get the news you need to start your day

| your@email.com | **Sign Up** |

Ruch is the second former city police officer charged with murder by District Attorney Larry Krasner, who said shortly after being sworn into office in 2018 that his predecessors were "biased" for failing to charge cops in fatal shootings. The new charges follow months of protests across the country in response to the death of George Floyd and other victims of police violence. The protests also have brought attention to problems of systemic bias and racism in policing.

"Dennis Plowden was shot and killed without justification by former Officer Eric Ruch," the grand jury wrote in its presentment. "Mr. Plowden was shot in the head, while he was unarmed, half lying, half sitting on the Opal Street sidewalk with his left hand raised in front of his head, as the officers shouted commands to show his hands."



**PHILADELPHIA POLICE DEPARTMENT**
Officer Eric Ruch Jr.

The grand jury found that Plowden appeared "dazed and lost" after he stumbled out of a borrowed car after the crash. While Ruch's colleagues took defensive positions and assessed the situation, Ruch did not seek cover and instead fired.

"Who shot?" one police officer asked, after patting down Plowden and finding no weapon, according to the presentment. "It was me. I fired," Ruch said.

» **BLACK AND BLUE:** *190 years of police brutality against Black people in Philadelphia*

The grand jury also found that another police officer at the scene — not named in the report — gave "two irreconcilable versions" of what happened.

On the night of the shooting, the officer "clearly stated, twice" that he had gotten out of his car and was "deliberately targeted" by the car Plowden was driving. But in his testimony before the grand jury, the same officer "stated he never got out of the car at all," according to the presentment.

Police have said they began pursuing Plowden on the night of Dec. 27, 2017, because he was driving a borrowed Hyundai that had been linked to a homicide — although they said he was not a suspect in the homicide. Plowden crashed the car, then got out onto the sidewalk.

"He was confused when the cops got out," one witness told the grand jury. "Dennis was just looking around like he was lost."

Officers at the scene said they were yelling for Plowden to show his hands and that he had been reaching his right hand into his pocket. An officer later recovered packets of what was believed to be heroin.

(Vincent Corrigan, an assistant district attorney in the Special Investigations Unit, said at a news conference Friday afternoon that the homicide case remains open but that police no longer believe the Hyundai was involved.)

Plowden had been on his way to deliver Christmas gifts to his mother in East Germantown, his family said.

"He was unarmed," Plowden's grandmother, Stacy McCoy, told The Inquirer shortly after the shooting. "They shot him like a goddamned dog."

"They could have stun-gunned him. They didn't have to do a kill shot," McCoy said. "They murdered my grandson like all the other Black kids out here."

Earlier in 2017, Ruch shot another man while on duty, and returned to work a month later. That suspect had been armed.

Plowden's wife, Tania Bond, 33, who would have celebrated their fifth wedding anniversary on Oct. 20, said she can now finally go to his grave and report some good news.

"I can go to the cemetery and say, 'Hey, hon, I know we still have a long way to go, but progress is being made,' " she said in an interview Friday. Bond, the mother of Plowden's 3-year-old son, said the nearly three years since her husband's death has been painful and confusing.

"I'm sitting at home wondering, where is Dennis' justice? Because everybody else's justice is moving on before his," she said. "So today took me by surprise to know that Ruch has finally been charged for his actions.

"But will he actually be found guilty of it? That's why it's such a long road to go."

Plowden was a father of two and stepfather of three. He was working as a house rehabber at the time of this death.

John McNesby, president of the Fraternal Order of Police Lodge No. 5, said in a statement Friday that the union would back Ruch.

"We will represent former police officer Eric Ruch Jr. against these serious charges," McNesby said. "Our attorneys will review the allegations and appropriately defend this officer. Officer Ruch Jr. is entitled to due process and we believe the judicial system will protect his rights to a fair trial."

The number of police shootings in Philadelphia has declined significantly in recent years. The Police Department reported 59 shootings by officers in 2012, and 43 in 2013. Following a news story on the sharp increase in police use of deadly force that year, then-commissioner Charles Ramsey asked the Justice Department to review the Police Department's policies and help implement reforms.

In 2017, the department reported 14 shootings by police, and in 2018, officers fired at 13 people. Last year, police said officers shot at people 9 times while on duty.

Paul Hetznecker, Bond's attorney who filed a civil rights lawsuit in federal court against the city and Ruch, said he and the city are in settlement negotiations.

"Holding police officers accountable for the use of deadly force in this city is long overdue," Hetznecker said. "The brutalization of young African American men has a long history in our city. The current Black Lives Matter movement reflects the immediacy of this paradigm shift."

In September 2018, Krasner charged fired officer Ryan Pownall with first-degree murder for fatally shooting David Jones after a traffic stop in North Philadelphia in 2017. It was the first time in two decades that a Philadelphia officer had been charged over an on-duty shooting, and was immediately blasted as an "absurd disgrace" by the police officers' union. A judge later downgraded the charges against Pownall to third-degree murder and related counts.

Pownall's trial is currently scheduled for April 2021 — a delay prompted in part due to efforts by Krasner's office to have a trial judge alter jury instructions on when cops are legally allowed to use their guns. The courts have rejected Krasner's arguments, which Pownall's lawyers have described as an attempt by prosecutors to change the laws against a defendant before trial.

Krasner's office last week appealed the issue to the Pennsylvania Supreme Court.

Hans Menos, executive director of the Police Advisory Commission, noted Friday that historically it has been difficult for prosecutors to win convictions against police officers.

"We have not held police officers accountable the way that residents of cities have wanted us to," said Menos, who is leaving his post later this month. "Dennis Plowden was involved in an activity that certainly should not have resulted in the end of his life. The discharge of a firearm at him was out of policy, and blatantly against police department rules."

*This is a developing story. Check back for updates.*

Posted: October 9, 2020 - 10:03 AM
William Bender | @wbender99 | wbender@inquirer.com

**Editor's Note**

The Inquirer does not host comments on most stories. **Here's why**.

## We Recommend

**More Philly lawyers are on Trump's impeachment defense team and one sued the president last year**

Jeremy Roebuck and Anna Orso

**HBO sets premiere for Kate Winslet show that was filmed in Philly suburbs**

Ellen Gray

**CDC study finds two masks are better than one; Pa. aims to vaccinate general public by summer; Murphy defends smokers being vaccinated before teachers**

Rob Tornoe, Marie McCullough and Allison Steele

**More snow is expected in the Philly area, including 2 to 3 inches from the city on south**

Anthony R. Wood

**St. Joe's and University of the Sciences propose merger**

Susan Snyder

**Democrats called to save the Postal Service, but now they're in power and struggling to help the failing agency**

Ellie Rushing



TWITTER    FACEBOOK    INSTAGRAM

**NEWS & INFO**

News / Sports / Entertainment / Business / Health / Food / Life / Opinion / Archives / Special Reports

**ABOUT US**

About The Philadelphia Inquirer / Advertise / Contact Us / Licensing & Permissions / Photo Reprints / Newspapers in Education / Jobs & Internships / Inquirer Events / Acel Moore Workshops / Newsroom Staff

**MARKETPLACE**

Inquirer Store / Find a Home / Job Listings / Special Sections / All Classifieds / Gift Subscriptions

**MOBILE APPS**

Inquirer News / Philly Sports Now





# EXHIBIT G

# The full list of Philadelphia's 66 problem cops

f    🐦    reddit    ✉    🔗

This document lists 66 current or former Philadelphia police officers whom former District Attorney Seth Williams identified as facing allegations of misconduct on and off the job.

This 18-page roster puts the officers into three categories to provide guidance for prosecutors:

*"Do Not Call" as a witness in court unless approved by a high-ranking DA.

*May use as a witness but first inform the defense attorney of the officer's alleged misconduct.

*Use without restriction but be aware of the noted misconduct.

In some cases, background information for officers on the list.

**See text only version**

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.

## Text version:

*Scroll for more >*

| Name | Rank | Date of Misconduct | Summary of Facts | PBI Finding/Arrest |
|------|------|--------------------|------------------|--------------------|
| Abrams, Anthony | PO | 6/1/15 | PO lied during a departmental investigation and aided and abetted his live-in girlfriend in a prostitution/escort business | PBI: 5/16/2017 Found guilty of Lying during a Departmental Investigation, Conduct Unbecoming, and Unapproved Outside Employment |
| Buzzone, Paul | PO | 5/26/17 | PO charged with DUI | Arrest: 5/26/2017 PO charged with DUI and accepted into ARD program for 6 months probation beginning 8/25/2017 |
| Cartagena, Jose | PO | 3/11/15 | PO assaulted complainant with his fist causing a fractured facial bone, and 5 days later activated his ECW on the same complainant | PBI: 8/29/2017 Pled Guilty to Conduct Unbecoming, Unauthorized and/or Excessive Use of Force in Official Capacity, and Neglect of Duty |
| Jones, Melville | PO | 10/19/15 | PO filed retaliatory EF.00 complaint | PBI: 2/20/2017 Found guilty of Unspecified Conduct unbecoming |
| King, Sean | PO | 9/18/14 | PO changed portions of his patrol log | PBI: 2/20/2017 Found guilty of Making false entry in departmental report |
| LaSalle, Anthony | Lt | 8/25/14 | Lt made false entries in DAR and misused 16 hours of time | PBI: 4/7/2017 Found guilty of Unspecified Neglect of Duty, and Unspecified Failure to Supervise |
| Livingston, Chris | PO | 10/9/16 | PO engaged in physical fight with another male outside of a wedding reception | PBI: 3/30/2017 Plead guilty to Unspecified Conduct unbecoming |
| Choudri, Hashaam | PO | 10/29/16 | PO solicited a prostitute | PBI: 4/23/2017 Found guilty of Association with Person of Ill Repute and Conduct Unbecoming |
| Cummings, Colin | PO | 2/22/17 | PO charged with DUI in Tioga County | Arrest: 2/22/2017 PO charged with DUI in Tioga County and placed on ARD probation for one year beginning 3/13/2017 |
| Davis, Stanley | PO | Pending | PO is subject of Federal Investigation an likely to face Federal charges | Arrest: Pending |
| Esack, Robert | PO | 1/26/16 | PO used his knee to strike complainant in the face twice | PBI: 7/14/2017 PO found Guilty of Conduct |

| Robert | | | complainant in the face twice causing broken facial bones | Guilty of Conduct Unbecoming and Unauthorized and/or Excessive Use of Force in an official capacity |
|---|---|---|---|---|
| **Folly, Emmanuel** | PO | 4/25/17 | PO was arrested and charged with sexual abuse of children (Child Pornography) | Arrest: 4/25/2017 Arrested and charged with sexual abuse of children (child pornography) NL: 1/30/2018, PTC |
| **Graham, Reginald** | PO | 11/1/13 | PO investigated by Federal authorities for several alleged acts of corruption | PBI: Retired before hearing |
| **Hall, Shawn** | PO | 5/14/17 | PO charged with DUI | Arrest: 5/14/2017 PO charged with DUI on ARD probation for one year beginning 12/15/2017 |
| **Harper, Nicholas** | PO | 8/2/17 | PO arrested for DUI | Arrest: 8/2/2017 PO charged with DUI on ARD probation for one year beginning 12/1/2017 |
| **Kennedy, Michael** | Sgt | | | |
| **Klein, Kevin** | PO | 12/24/16 | PO charges with SA, DUI and Leaving the scene of an accident. | Arrest: 12/20/2017 PO charged with SA, DUI and Leaving the scene of an accident NL: 1/19/2018, Status |

| Lewis, Deric | PO | 12/30/17 | PO charged with Simple Assault in Delaware County, PA | Arrest: 12/30/2017 PO charged with Simple Assault in Delaware County, PA |
|---|---|---|---|---|
| Linder, Eric | Crp | 7/23/17 | Crp arrested for DUI | Arrest: 7/23/2017 Crp arrested for DUI NL: 1/9/2018, Trial |
| Logan, Allen | PO | 12/27/17 | PO arrested for Simple Assault in Atlantic City, NJ | Arrest: 12/27/2017 PO arrested for Simplae Assault in Atlantic City, NJ |
| Long, Michael | PO | 3/23/17 | PO abused dog | Arrest: 3/23/2017 Animal Cruelty/PIC NL: 5/7/2018, Trial |
| Mayhew, Antonio | PO | 5/3/17 | PO charged with AA | Arrested 5/3/2017 PO charged with A.A. NL: 2/13/2018, PTC |
| McAdams, Alex | PO | 10/23/16 | PO charged with multiple counts of SA, REAP, TT and Contempt of PFA | Arrest: 2/1/2017 PO charged with SA, REAP, TT and Contempt of PFA NL: 3/2/2018, Trial |
| McFadden, Anthony | Lt | 2014-2015 | Lt engaged in sexual text communication with a prostitute on- duty, lied in an IAD interview, drank alcohol then drove city car on-duty, misused city time, and accepted gifts from news reporters | PBI: 1/10/2017 Entered into a plea agreement, and plead guilty to lying during an investigation, inappropriate sexual communication, drinking alcohol on duty, driving a city vehicle after drinking alcohol and improper use of department equipment |
| Nordo, Phillip | Det | 8/25/17 | Det suspended with the intent to dismiss | Suspended: 8/25/2017 Det suspended with the intent to dismiss |
| O'Brien, Steven. | Lt | 5/26/16 | Lt lied in an IAD interview concerning a domestic assault incident with Lt's finance | PBI: 1/10/2017 Found guilty Lying during a investigation and Unspecified Conduct unbecoming |
| Ortiz, Angel | PO | 9/1/11 | PO mishandled evidence in a narcotics investigation, made false entries in PARS and left out important information in communication with other officers | PBI: 3/8/2017 Found guilty of making False Entries in a police report, and Failure to follow procedures for handling narcotics |

| Pownall, Ryan | PO | | | |
|---|---|---|---|---|
| Pressley, Shelia | Sgt | 5/22/14 | Sgt physically assaulted another Sgt, made false statement in a police report, and lied during an IAD investigation | PBI: 4/7/2017 Found guilty of Lying during an investigation, Engaging in Harassing Conduct towards a police officer and Failure to Properly Supervise |
| Pressley, Shelia | Sgt | 6/12/14 | Sgt lied in interview to IAD concerning an EEO complaint that she filed against another officer | PBI: 4/3/2017 Found guilty of Lying during an investigation |
| Ricks, Edward | PO | 10/1/14 | PO made false statements in police report (entered wrong driver in accident report) | PBI: 8/22/2016 Plead guilty to making a False Entry in a police report |
| Romero, Angelo | PO | 11/1/16 | PO lied in interview to PPD concerning shooting he witnessed | |
| Scott, Ross | PO | 5/18/17 | PO charged with AA | Arrest: 5/18/2017 PO charged with AA NL: 1/8/2018, FTC |
| Smith, Brian | Sgt | 8/25/17 | Sgt indicted by US Atty on bribery and lying to federal authorities | Suspended: 8/25/2017 Sgt suspended for 30 days with the intent to dismiss |
| Smith, Gerald | PO | 3/5/16 | PO charged with Burglary and other related offenses | Arrest: 4/282017 PO charged with burglary and other related offenses NL: 1/4/2018, Trial |
| Snell, Eric | PO | | PO arrested for conspiracy to deliver drugs in Maryland | |
| Soto, Adam | PO | 4/25/17 | PO charged with manslaughter and homicide by vehicle | Arrest: 4/25/2017 Arrested and charged with manslaughter and homicide by vehicle NL: 1/4/2018, SC |
| Spicer, Michael | Sgt | | Sgt arrested by Federal authorities for several acts of corruption | PBI: 9/10/2014 Dismissal based upon arrest by Federal Authorities. Reinstated after acquitted at Trial |
| Sugan, Joseph | PO | 5/24/17 | PO charged with DUI in Montgomery County | Arrest: 5/24/2017 PO charged with DUI in Montgomery County NL: 11/28/2017, Trial PO to receive ARD for one year starting on 11/28/2017 |
| Williams, Sequeta | PO | 6/12/17 | PO charged for IT and SA | Arrest: 6/12/2017 PO charged with TT and SA NL: 1/9/2018 Trial |

| Bonk, David | Lt | 2014 | Lt misused time by leaving work early, and taking pilot lessons while on duty | PBI: 2/23/2017 Plead guilty to Unspecified Neglect of Duty and Unspecified Failure to Supervise |
| --- | --- | --- | --- | --- |
| Bullock, Erik | PO | 11/28/15 | PO harassed and threatened<br>CWs by damaging front door, using inappropriate language, and pointing his gun in<br>CW's direction | PBI: 4/7/2017 Plead guilty to Unspecified Conduct unbecoming, unauthorized absence, and unauthorized use of department equipment |
| Conn, Robert | Det | 9/26/16 | Det improperly released to an attorney the interview of a sexual assault complainant | PBI: 12/13/2016 Plead guilty to communicating law enforcement information to unauthorized person |
| DeLaurentiis, Mario | PO | 7/9/16 | PO posted an inappropriate image on his social media account (Facebook) that violated PD policy | PBI: 5/29/2017 Plead Guilty to Failure to Comply with Police Commissioners Directives |
| Farrell, William | PO | 5/10/13 | PO made false statements in police report | PBI: 12/1/2016 Plead guilty to Unspecified Conduct unbecoming |
| Fitzgerald, Rich | PO | 4/17/14 | PO used unregistered informant to make drug buy and input incorrect information on informant voucher form, and failed to record basic information | PBI: 4/7/2017 Found guilty of Failure to Comply with Commissioner's directives |
| Green, Aaron | Sgt | 11/17/15 | Sgt left detail to take a promotional exam | Plead guilty to Unauthorized Absence and |
| Gross, Michael | Lt | 12/1/14 | Lt arrived late to work on three occasions, and failed to properly document the approval of a subordinate's vacation | PBI: 7/23/2017 Plead guilty to neglect of duty and failure to supervise unspecified |
| Jackson, Ronald | PO | 4/18/16 | PO, while off-duty, assaulted his GF by grabbing her neck, choking her and biting her left hand | PBI: 4/7/2017 Plead guilty to Unspecified Conduct unbecoming |
| Jean, Joel | PO | 7/24/17 | PO deployed ECW under circumstances where not justified | PBI: 2/23/2017 Plead guilty to Failure to Comply with Commissioner's Order |
| Mazzoni, Steve | PO | 11/25/12 | PO conducted an illegal warrantless search, and made false statement to detective | PBI: 4/7/2017 Plead guilty of Unspecified Conduct unbecoming and Failure to Comply with Commissioner's directive |
| McClain, Lain | Sgt | 2015 | Sgt made sexual comments and touched officers inappropriately | PBI: 2/20/2017 Plead guilty to Course of Conduct which constitutes harassing behavior based on gender and sexual orientation |
| McCuem, Matthew | PO | 11/19/17 | PO deployed is ECW on a person who was not a threat | Plead guilty to Failure to Comply with Commissioner's Order and Unauthorized |

| | | | | Order and Unauthorized Absence from Assignment |
|---|---|---|---|---|
| **Montgomery, Rahim** | PO | 10/15/16 | PO, while off-duty, destroyed property inside his home and assaulted his spouse | PBI: 6/14/2017 Found guilty of unspecified conduct unbecoming |
| **Osisos, Earl** | PO | 2/6/15 | PO forced open front door to apt. that he was evited from on the same date causing damage | PBI: 3/30/2017 Plead guilty to Unspecified Conduct unbecoming |
| **Rashad, Tariq** | PO | 9/24/14 | PO lied to IAD re: relationship to complainant | PBI: 9/15/2016 Found guilty of Lying during departmental investigation |
| **Sanchez, Natalie** | Det | 1/17/17 | Det signed the name of another Det on a SW | PBI: 5/11/2017 Pled Guilty to Making False Entry in a Departmental Record |
| **Santiago, Rubben** | PO | 1/10/14 | PO made false entries in his patrol log and misused 9 hours of his time | PBI: 1/23/2016 Plead guilty to Unspecified Conduct unbecoming, and Making a false entry in a departmental report |
| **Schill, Frances** | PO | 1/21/15 | PO tased, handcuffed prisoner | PBI: 8/22/2016 Plead guilty to Failure to comply with Commissioner's directives |
| **Smith, Warren** | PO | 9/3/14 | PO deployed OC spray and kicked a handcuffed prisoner in the Sally Port at CFCF | PBI: 2/22/2017 Plead guilty to Excessive Use of Force |
| **Soto Jr., David** | PO | 2014 | PO failed to notify supervisor of his uncertainty if he was needed for court hearings | PBI: 5/15/2017 Plead guilty to Failure to Comply with Commissioner's directives |
| **Soto Sr., David** | PO | 2014 | PO incorrectly listed his son as arresting officer in PARS report | PBI: 5/15/2017 Plead guilty to Failure to Comply with Commissioner's directives |
| **Torres, Ceasar** | PO | 5/22/16 | PO physically assaulted his girlfriend | PBI: 1/10/2017 Plead guilty to Unspecified Conduct unbecoming |
| **Vallette, Charles** | PO | 2/10/16 | PO lied during a departmental investigation | PBI: 5/25/2017 Found Guilty of Lying during an investigation |
| **Wardlaw, Khalif** | Sgt | 1/24/16 | Sgt. Used the term 'faggot' during an altercation with a Crp | PBI: 9/27/2016 Plead guilty to Unspecified Conduct unbecoming |
| **Waters, Brian** | PO | 5/10/13 | PO made false statements in police report | PBI: 8/22/2016 Plead guilty to Unspecified Conduct unbecoming |
| **Young, Tremayne** | Sgt | 1/10/14 | Sgt made false entries in his patrol log and misused 28 hours of his time | PBI: 1/23/2016 Plead guilty to Unspecified Conduct unbecoming, and Making a false entry in a departmental report |